[No. 41908-1-I. Division One. August 9, 1999.]

BARBARA TORRES, *as Administratrix, Appellant,* v. THE CITY OF ANACORTES, ET AL., *Respondents.*

*Lembhard Goldstone Howell*, for appellant.

*William P. Schoel* and *Jayne Lyn Freeman* of *Keating, Bucklin & McCormack, P.S.*, for respondents.

BECKER, J. — Anacortes police initiated an investigation into Shelley McGuffey's complaint that her ex-husband Michael had assaulted her with a gun. They promised to discuss the case with the prosecutor the next day to see if charges would be filed, but they never made the referral. Weeks later, Michael shot and killed Shelley. Shelley's estate sued the City of Anacortes for wrongful death on a theory that the Anacortes police owed Shelley a duty arising from a special relationship. The trial court, finding no duty,

dismissed the suit on summary judgment. We reverse. The promise by the police to refer Shelley's case to the prosecutor for a charging decision was an express assurance of assistance, and a jury could find Shelley reasonably relied upon that assurance.

Upon review of an order of summary judgment, the appellate court engages in the same inquiry as the trial court and considers the facts in the light most favorable to the nonmoving party. Summary judgment will be granted if the record demonstrates that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c); *Phillips v. King County*, 87 Wn. App. 468, 476, 943 P.2d 306 (1997), *aff'd*, 136 Wn.2d 946 (1998).

Michele (Shelley) McGuffey's complaint to the Anacortes police in August 1993 repeated a pattern. Earlier that year, when she and Michael were still married and living in Mt. Vernon, Shelley made a similar complaint to the Mt. Vernon police that Michael had raped her, imprisoned her, and assaulted her with a gun. Shelley ultimately decided not to press charges on that occasion. But before discontinuing their investigation, the Mt. Vernon police thoroughly documented the evidence she provided to them of Michael's assaults and threats.

According to the account of the Mt. Vernon detective who interviewed her on March 3, 1993, Shelley reported she had been married to Michael McGuffey for seven years. Michael became physically abusive toward Shelley in 1988 when they were living in Texas. On one occasion that Shelley reported to the San Angelo Police Department, Michael poured hot grease on her head causing burns to her scalp. On another occasion, Michael took a .38 caliber handgun and put it to Shelley's head, telling her she must stay with him "or else." That evening, he forced her to have sex with him while he held on to the gun. Shelley left him the next day and went to her mother's residence in Anacortes. When Shelley found she was pregnant, she decided to rejoin Michael.

In March of 1990, the couple moved with their infant daughter to Mt. Vernon, Washington. In late 1992, Michael again became abusive. He did not want Shelley to have a job, go to school, or associate with her friends. In early December, Shelley arrived home from a friend's house 10 minutes late. Michael, yelling, followed Shelley into their daughter's bedroom and with the child watching, pushed Shelley down on the floor, punched her in the eye, pulled out a handful of hair, and slapped her.

The next incident of violence happened after a New Year's Eve party a few weeks later. Michael thought he saw another man touch Shelley, became enraged, and insisted on leaving. Driving back to Anacortes, Michael hit Shelley, pulled her hair, and threatened to drive off the road. Michael then forced her face down onto his crotch and made her give him oral sex while he was driving. He threatened to drive them both off the Deception Pass Bridge. When they arrived home, he got a gun and said he was going to shoot himself. Then he went to bed.

Shelley had arranged to start school in a nursing program on January 4, 1993. On the evening of January 3, Michael began to argue with Shelley and asked her to tell him honestly if she wanted a divorce. Shelley said she did, though based on past experience she was afraid her answer would provoke a violent response. Michael at first appeared to agree to a divorce. Two hours later, he changed his mind and said "you're right; I'm not going to let you have a divorce." He began pushing her around. Then he got out his .38 caliber handgun, put it near the bed, and told Shelley that if she was not going to be with him, she was not going to be with anyone else either. He forced her to have sex. Then, wielding the gun, he refused to let her leave the room. He told her he was going to kill her in the morning, and went to sleep with the gun under his pillow.

The next morning, Michael told Shelley he would not kill her if she would abide by his rules. Shelley began to plan an escape from Michael. On February 2, 1993, she moved to a shelter for battered women. After living there for the

next several weeks, she contacted the Mt. Vernon police to make a criminal complaint.

The Mt. Vernon detective recorded this history of events as Shelley related it to him in March, 1993. The detective told Shelley he would investigate further. According to his police report, "Shelley said that she does wish to pursue this complaint and is interested in having a criminal charge filed. Shelley said that she is afraid of Mike and believes that Mike will attempt to harm her once he finds out that she had made a criminal complaint against him."

Upon further investigation, the detective obtained corroborating information. He received police reports from San Angelo. He talked with witnesses who had heard Shelley's daughter describe her father pushing her mother down on the floor. A friend of Shelley confirmed that Shelley had a black eye and bruises. The friend also said she had heard about the New Year's Eve incident from Shelley shortly after it occurred and had seen loaded guns in the house when she went to help Shelley move out. The detective also obtained from Shelley threatening letters Michael sent her after she left him.

On March 26, 1993, a memorandum from the Mt. Vernon police advised the Anacortes police about their current investigation into "a spousal rape case on Mike McGuffey." The memorandum reported, "Mike McGuffey is somewhat unstable, and has access to several firearms. Michele and Mike are in the process of a divorce, and things are starting to get ugly. He *does not* know where she is staying at this time. —Use caution when contacting him."

At the end of April, 1993, Shelley asked to meet with the Mt. Vernon detective and the Skagit County prosecutor. According to the detective's report, Shelley told them she did not want them to go forward with her complaint. They advised Shelley that she could ask to have the case reopened if she changed her mind. The Mt. Vernon police report ends on April 29 with the notation, "At this time the case will be closed."

Shelley moved with her daughter into an apartment in

Anacortes. She got a job working at a restaurant. She filed for divorce. On July 11, 1993, the Mt. Vernon Police Department received a telephone call from a woman who had been dating Michael. The Mt. Vernon police included a notation about the telephone call in their investigative file. The woman said she was concerned about Shelley's welfare because Michael had been talking about killing Shelley. The woman also reported that Michael carried weapons in his car.

On the evening of August 11, 1993, Michael approached Shelley at work. They sat and talked. Michael left after telling her that she had ruined their marriage and that he did not like the fact that she was seeing someone else. At 2:15 A.M., Michael was waiting for Shelley as she arrived home from work. Michael hit Shelley on the back of her head with a gun, forced her to have sex with him, and threatened more violence in the future. When Michael left at about 10 A.M. that same day, August 12, Shelley called her mother, Barbara Torres. Torres came to Shelley's apartment at 10:30 A.M. and saw that Shelley had been injured. Torres called the Anacortes Police Department at 2:14 P.M. to report the assault.

Anacortes Police Officer Loftis went to investigate. Shelley told the officer she did not want to make a formal complaint against Michael because she feared his retribution. Officer Loftis advised Shelley to call if she changed her mind. He did not file a written report, despite a departmental policy requiring one whenever there is an allegation of assault with a weapon.

The following night, Anacortes Sergeant Lindquist noticed the absence of a written report about the August 12 incident. He sent Officer Liddle to determine whether Shelley was willing to make a complaint. Not finding Shelley at home, Officer Liddle met with Torres at her apartment and listened to a message left by Shelley on Torres' telephone answering machine. Shelley's message said she had left for the weekend to stay with friends, and had a gun with her for self-defense. The message went on to say

that Officer Loftis "acted like he could have cared less" about the August 12 incident and told Shelley the only thing that would happen to Michael was that he would get "a summons to court, a $200.00 fine, and walk." Officer Liddle asked Torres to encourage Shelley to come to the police station when she arrived back home.

On August 15, Shelley, still with noticeable bruises, went with her mother to the Anacortes Police Department to discuss the August 12 incident. They met with Sergeant Lindquist. Shelley wrote out a lengthy report of the assault. Sergeant Lindquist discussed with her the previous incidents of domestic violence in Texas as well as the incidents recorded in the Mt. Vernon police report. He pointed out that Shelley had "backed out of" the Mt. Vernon case, and asked her if she would take a polygraph test "in the interest of convincing the County Prosecutor that she was standing the test" this time. Shelley agreed to take a polygraph test. Recognizing the seriousness of the charges—"I realized we're looking at a rape, unlawful imprisonment, first degree assault"—Sergeant Lindquist concluded that a detective needed to be involved in the case. He called Detective Korterud down to the station and briefed him on Michael's history of assaults and use of weapons.

According to Detective Korterud's report of his conversation with Shelley on this occasion, Shelley was instructed to contact the Skagit County District Court and get a no-contact order against Michael. Detective Korterud also promised Shelley an immediate referral of her case to the prosecutor. "I told her I would be discussing this case on the morning of 08-16-93 with the Prosecuting Attorneys Office to see if charges will be filed against Mike McGuffey."

Shelley obtained a no-contact order the next day. The order restrained Michael from coming within 100 feet of Shelley or her daughter and directed him to surrender all deadly weapons to the police. Shelley gave a copy of the order to Anacortes police, and informed them that Michael carried two handguns with him.

On August 17, according to his report, Detective Korterud pulled a car over after he recognized its driver to be Michael. Detective Korterud approached the car and observed an ammunition clip in the glove compartment when Michael opened it to look for the vehicle registration. Upon request, Michael relinquished a loaded .38 caliber handgun that he took from under the driver's seat. He also turned over the ammunition clip. The clip, a "Glock" brand, contained 13 rounds of .10 mm ammunition for a semiautomatic weapon. Telling Michael he needed to talk to him about an assault investigation, Detective Korterud brought Michael to the police department. There, after advising Michael of his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3d 974 (1966)), Detective Korterud informed him that Shelley had filed a complaint the previous week. He related Shelley's allegation that Michael had put a gun to her head and forced her to have sex. Michael declined to answer any questions. Detective Korterud fingerprinted and photographed Michael, had him served with the no-contact order, and then released him. He did not ask questions about or attempt to find Michael's second gun, the one associated with the semiautomatic ammunition clip.

Later, when asked in a deposition why he did not arrest Michael at that time, Detective Korterud said he lacked probable cause to do so and "hadn't completed an investigation at that time point." He acknowledged seeing Shelley's black eye, but said that before he could make an arrest he first needed "physical evidence," such as "bodily fluids, hairs, fibers, fresh bruising, being able to see fresh cut on the head, clothing items, physical evidence items." The detective said that for the evidence to be "fresh enough" to constitute probable cause to arrest a suspect for felony assault, the assault would have to be reported immediately "after the act occurred."

Within a day or two of his encounter with Michael, Detective Korterud "had a discussion" in the Skagit County prosecutor's office. The detective was informed about the

investigation conducted earlier that year by the Mt. Vernon police. He obtained and reviewed the Mt. Vernon police report.

On August 24, Detective Korterud had a telephone conversation with Shelley. According to his report of that date, Shelley told him that after consultation with her divorce attorney, she had decided to drop the rape charge against Michael and pursue only the assault charge. She said she hoped Michael could be required to get enrolled in anger management classes or get counseling in lieu of jail time. According to Detective Korterud, "I informed Shelley McGuffey that the criminal charges to be filed would be the decision of the prosecutor's office, and the sentence imposed would be up to the courts." He did not tell Shelley that he had not yet referred the case to the prosecutor for a charging decision.

The record does not show that the Anacortes police had further contact with Shelley. or Michael, or conducted any further investigation. Detective Korterud never forwarded the case to the prosecutor. Detective Korterud maintained in his deposition testimony that even after reviewing the Mt. Vernon police file, he still believed he lacked probable cause to arrest Michael. He did not, however, identify any other work that was needed to complete the investigation. And he acknowledged that he could have taken the case to the prosecutor with the information he had. When asked why he did not refer the case to the prosecutor for a charging decision, Detective Korterud responded, "Because I was busy working on another case." He also said he "got the impression from her that she was real hesitant of going through with anything."

Meanwhile, Shelley finalized her divorce from Michael and took back her maiden name of Torres. She remained in Anacortes and continued to work in the restaurant. Five weeks later, just before noon on September 27, 1993, Michael was waiting for Shelley when she arrived at work. Shelley at first locked the door of her car, but then allowed Michael to sit down in the passenger seat. After they talked

for a few minutes, Michael pulled out a gun and shot her to death. Michael fled from the scene and has not been apprehended. Investigation of the crime scene revealed a .10 mm Nyclad unspent ammunition cartridge next to the car on the passenger side. Police learned from an informant that Michael had recently been displaying a Glock .10 mm semiautomatic handgun that he had purchased in Texas several months before.

## SPECIAL RELATIONSHIP

Shelley's mother, Barbara Torres, filed a wrongful death action against the City of Anacortes. The City moved for summary judgment on the basis of the public duty doctrine. In response to the City's motion, Torres argued that the police had a duty to Shelley by virtue of a special relationship. The trial court granted the City's motion. Torres appeals from the order of dismissal.

The threshold determination in any negligence action is whether the defendant owes a duty of care to the plaintiffs. *Noakes v. City of Seattle*, 77 Wn. App. 694, 697, 895 P.2d 842, *review denied*, 127 Wn.2d 1021 (1995). Under the "public duty doctrine," there is no liability for a public official's negligent conduct unless it is shown that " 'the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (*i.e.*, a duty to all is a duty to no one).' " *Taylor v. Stevens County*, 111 Wn.2d 159, 163, 759 P.2d 447 (1988) (quoting *J&B Dev. Co. v. King County*, 100 Wn.2d 299, 303, 669 P.2d 468 (1983)).

In its requirement of a duty owed to the injured person as an individual, as opposed to a duty owed to the public in general, the public duty doctrine expresses a basic principle of negligence law. *Taylor v. Stevens County*, 111 Wn.2d at 163; *see also Bailey v. Town of Forks*, 108 Wn.2d 262, 266-67, 737 P.2d 1257 (1987). One way to show a duty owed to the injured person as an individual is to show that a "special relationship" exists between the plaintiff and the

governmental body. *Phillips v. King County*, 87 Wn. App. at 481. The special relationship inquiry is a "focusing tool" used to ensure that the duty asserted is specifically focused on the claimant and is not merely a general duty to the public at large. *Taylor v. Stevens County*, 111 Wn.2d at 166.

The relationship of police officer to citizen is too general to create an actionable duty. Courts generally agree that responding to a citizen's call for assistance is basic to police work and not special to a particular individual. *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 279, 80 Cal. Rptr. 2d 196 (1998). Courts frequently deny recovery for injuries caused by the failure of police personnel to respond to requests for assistance, the failure to investigate properly, or the failure to investigate at all. *Williams v. State*, 34 Cal. 3d 18, 25, 664 P.2d 137, 192 Cal. Rptr. 223 (1983); *see also Dever v. Fowler*, 63 Wn. App. 35, 45, 816 P.2d 1237 (1991), *review denied*, 118 Wn.2d 1028 (1992) (there is no cause of action for negligent police investigation). To create a special relationship between police officer and citizen, Washington law requires direct contact setting the citizen apart from the general public, and "express assurances" of assistance that give rise to a justifiable reliance on the part of the citizen. *Beal v. City of Seattle*, 134 Wn.2d 769, 787, 954 P.2d 237 (1998). An actionable duty to provide police services can arise if all these requirements are met.

The parties agree that Shelley had direct contact with the police, setting her apart from the general public. At issue is whether the record provides evidence that the Anacortes police made express assurances upon which Shelley justifiably relied.

Torres contends that police owe an individualized duty to protect a person threatened by assault when there is evidence of a recent assault, the police have knowledge of a history of violent assaults by the assailant against the victim, and the victim obtains a protective order. She offers *Raucci v. Town of Rotterdam*, 902 F.2d 1050 (2d Cir. 1990), as authority for this proposition. There, the Second Circuit

applied New York law to affirm a plaintiff's verdict in a wrongful death case arising out of similar facts. A woman complained of her estranged husband's assaults and threats to kill her. She cooperated with the ensuing police investigation by taping his threatening telephone calls at the request of the police to assist them in building a case. The police arrested the husband but did not provide the arraignment judge with the full history of violence and did not provide the tapes. As a result, the husband was released on bail of only $500. The husband shot the victim week later. The court held that a duty based on a special relationship could arise from these facts. *Id.* at 1058.

Torres argues that the Anacortes police similarly formed a special relationship with Shelley when they instructed her to get a no-contact order, assisted her by serving it on Michael, and enlisted Shelley's participation in the investigation by asking her to take a polygraph test. But unlike Washington's test for a special relationship, New York's does not require "express assurances." Because the legal analysis in *Raucci* differs from the analysis required in this state, we cannot use it as a template for our own decision notwithstanding the similarity in the facts.

In Washington, "a governmental duty cannot arise from implied assurances."[1] *Honcoop v. State*, 111 Wn.2d 182, 192, 759 P.2d 1188 (1988). Because duty arises from the facts presented, it is ordinarily a question for the jury whether the facts "give rise to what a reasonable person under similar circumstances would take as explicit assurances and then reasonably rely upon those assurances in taking or refraining from taking action." *Noakes v. City of Seattle*, 77 Wn. App. at 700.

It is routine police work to instruct a victim of domestic violence to get a no-contact order, to assist by serving it, to

---

[1]*Chambers-Castanes v. King County*, 100 Wn.2d 275, 286, 669 P.2d 451 (1983) earlier held "assurances need not always be specifically averred, as some relationships carry the implicit character of assurance," but later cases applying Washington law overruled that holding. *See Johnson v. State*, 77 Wn. App. 934, 939 n.12, 894 P.2d 1366, *review denied*, 127 Wn.2d 1020 (1995).

take guns from individuals who have been ordered to surrender them, and to suggest that complaining witnesses take polygraph exams. To hold that these routine responses to a report of violent crime amount to an enforceable promise that "we will protect you" would dramatically increase the scope of the duty owed by municipalities to crime victims who have previously been in contact with the police. Taking all inferences in the light most favorable to Torres, a reasonable person in Shelley's circumstances would not understand any of these actions as an explicit promise that the Anacortes police would arrest Michael, track down all of his guns, or take other specific steps to protect her. Because the Anacortes police gave no express assurances of protection in connection with their activity related to the protective order, we hold that such activity did not create a special relationship.

*Beal v. City of Seattle*, 134 Wn.2d at 773-74, is the Supreme Court's most recent decision finding evidence of a special relationship created by express assurances that a victim justifiably relied upon. The victim called 911 and asked for police assistance in removing her belongings from her estranged husband's apartment, saying that he had been beating and threatening her and now reportedly had a gun. She was still waiting outside the apartment for the police to arrive when, 20 minutes later, the husband shot and killed her. *Id.* at 773. The victim's estate alleged that the City's failure to dispatch a police officer promptly in response to her 911 call was a breach of a duty owed to her as an individual. The City asserted the public duty doctrine as a defense, but the Supreme Court found a special relationship established by the assurances of police protection given by the 911 dispatcher:

> 911: Okay. Well I'll tell you what, we're going to send somebody there. Are you going to wait in number 4 [another apartment] until we get there?

> CALLER: I'll be waiting outside in the front with my mom.

> 911: Okay. We'll get the police over there for you okay?

CALLER: Alright, thanks.

*Id.* at 785.

In *Beal,* the victim received express assurances that the police would protect her at a specific time and place. Shelley received no such assurances. The police probably did foresee that Michael would attack Shelley again, but in contrast to *Beal* they had no way of knowing when and where it would happen. Consequently, there was no assurance analogous to "We'll get the police over there for you."

There was, however, an explicit statement made to Shelley that the police would refer her assault and rape report for a charging decision. Torres contends that the failure to forward the case to the prosecutor breached a duty explicitly assumed by Detective Korterud.

On August 15, the day Shelley made her complaint at the Anacortes police station, Detective Korterud told her he would discuss the case the next morning with the prosecutor's office "to see if charges will be filed against Mike McGuffey." On August 17, the police encountered Michael with the .38 handgun and the Glock ammunition. They took the handgun away from him but knew it was likely he still had access to a Glock. Notwithstanding the danger this presented to Shelley, the police did not refer the file to the prosecutor. Yet, in a telephone conversation with Shelley on August 24, Detective Korterud informed her "that the criminal charges to be filed would be the decision of the prosecutor's office."

We agree with Torres that Detective Korterud's two statements about the charging decision create issues of material fact precluding summary judgment on the issue of duty. Whether a reasonable person in Shelley's circumstances would regard these statements as an assurance that the prosecutor had her file, knew about the situation, and was considering whether to bring charges cannot be resolved as a matter of law. A person in Shelley's circumstances could reasonably have understood that a promise to forward the file to the prosecutor had great significance

to her safety. Shelley herself, just five months earlier in Mt. Vernon, accompanied a police officer to discuss a very similar investigation with the same county prosecutor. At that time, after weighing the potential benefits of a successful prosecution against her fear of Michael's reaction, Shelley decided not to press charges. But Shelley knew the prosecutor was willing to prosecute if she changed her mind.

According to *Beal*, the duty created by a special relationship "is defined at least in part by the nature of the assurances given." *Beal v. City of Seattle*, 134 Wn.2d at 787. Here, the explicit assurance given did not create a legal duty to provide Shelley with constant police protection. It created a simple, narrowly defined duty either to refer the case to the prosecutor as promised, or else to withdraw that promise so that Shelley could consider her other options. A jury could conclude that Detective Korterud's statement on August 24 created the impression that he had honored his promise to refer the matter on the morning of August 16.

If the police had in fact forwarded the file to the prosecutor and the prosecutor had either refused or neglected to file charges, dismissal on summary judgment would have been appropriate. The police would have done all they promised to do. As the City points out, Detective Korterud did have a discussion with the prosecutor's office a day or two after serving the protective order on Michael. But noticeably absent from the record is a declaration from the prosecutor stating that he received a referral of the case. Detective Korterud acknowledged in his deposition that he did not in fact forward the file to the prosecutor. Taken in the light most favorable to Torres, the record establishes both that Detective Korterud expressly promised to refer the case to the prosecutor, and that he did not do so.

Whether the promise to refer the case for a charging decision was an assurance inducing reasonable reliance is also a fact question not amenable to summary judgment. *See id*. at 786-87. Stalked by a violent predator, Shelley had only two legal options for protecting herself—to seek help

from the police in putting Michael behind bars, or to hide. In the past, she had tried hiding. In 1990, she escaped from Michael by moving from Texas to Washington. In early 1993, she escaped him by taking refuge in a shelter. But in August 1993, Shelley chose to seek help from the police. A jury could conclude that Shelley remained in Anacortes, going about a normal life without trying to hide from Michael, only because she reasonably relied on the express assurance that her case had been referred for a charging decision. Further evidence of her reliance is the fact that she obtained a protective order and gave it to the police to serve, notwithstanding her well-documented fear of Michael's reaction once he realized she had reported him to the police.

Detective Korterud explained that the reason he did not forward the file was that he was busy working on another case. He also expressed concern about lacking probable cause. If he had not promised an immediate referral, a jury would not be allowed to second-guess his reasons. As the City argues, the methods and timing of a police investigation are ordinarily not subject to scrutiny in a negligence action. But here, the detective's express assurance created a duty owed to Shelley to act in accordance with the assurance. When such a duty exists, a jury must be allowed to decide whether the failure to so act was a breach of duty.

A jury will not necessarily accept Detective Korterud's explanations at face value. An alternative explanation may be inferred from his comment that Shelley was "real hesitant" to go through with her complaint: that the Anacortes police, concerned that Shelley once again would abandon the charges, decided simply to shelve the file rather than refer it to the prosecutor. A jury may decide that this decision was negligence.

We hold that the trial court erred in ruling as a matter of law that the promise to refer Shelley's case to the prosecutor did not create a special relationship.

## DUTY TO CONTROL WRONGDOER

As an additional basis for a duty owed by the police,

Torres argues the police exercised custodial authority over Michael. Certain custodial relationships between a government agency and a person who does harm can give rise to a duty to control the actions of that person. *Taggart v. State*, 118 Wn.2d 195, 219-20, 822 P.2d 243 (1992). This principle effectively amounts to a fifth exception to the public duty doctrine. *See id.* at 219 n.4. But issues not briefed or argued in the trial court are generally not considered on appeal. *Dorsch v. City of Tacoma*, 92 Wn. App. 131, 134 n.4, 960 P.2d 489 (1998), *review denied*, 137 Wn.2d 1022 (1999). Because Torres did not raise this argument below, she has not preserved it for review.

## FAILURE TO ENFORCE

■■ Torres also contends that certain statutes imposed upon the police a duty to arrest Michael. Failure to enforce the law is another exception to the public duty doctrine, but to come within it the plaintiff must show, among other things, that a statutory duty to take corrective action exists. *Ravenscroft v. Washington Water Power Co.*, 87 Wn. App. 402, 415, 942 P.2d 991 (1997), *reversed on other grounds*, 136 Wn.2d 911 (1998). Below, the City took pains to rule out the state domestic violence protection act (DVPA), RCW 10.99, as the source of such a duty. The DVPA is an example of a statute that can give rise to an actionable duty in certain situations. It creates a mandatory duty to arrest an offender or conduct an ongoing investigation but only within "four hours" of an incident of domestic violence. RCW 10.31.100(2)(b). Here, more than four hours elapsed between Michael's departure from Shelley's home after the rape and assault, and the telephone report to Anacortes police by Shelley's mother. As this court held in *Donaldson v. Seattle*, 65 Wn. App. 661, 675, 831 P.2d 1098 (1992), *review dismissed*, 120 Wn.2d 1031 (1993), the DVPA cannot be the source of a duty to arrest once more than four hours has elapsed.

Torres made it clear below that she was asserting a duty based on a special relationship, not on a failure to enforce

the DVPA. She identified no other statute creating a mandatory duty to arrest and therefore did not establish a duty based on a failure to enforce.

The order granting the City's motion for summary judgment is reversed. Torres may proceed with her case on the theory of a special relationship.

Cox, J., concurs.

Baker, J. (dissenting) — I must respectfully dissent. Detective Korterud made the following statement:

> "I told her I would be discussing this case [the next morning] with the Prosecuting Attorneys Office to see if charges will be filed against Mike McGuffey."

Detective Korterud subsequently told Shelley that the criminal charges to be filed would be the decision of the prosecutor. Even viewing both of these comments in the light most favorable to Torres, this case does not set forth a claim that can survive summary judgment.

During oral argument before the trial court, Plaintiff's counsel conceded that nothing the Anacortes Police Department said amounted to an express assurance that Shelley Torres would be protected:

[Plaintiff's Counsel]: Your Honor, we don't have a statement that we will go out and—

The Court: Protect you.

[Plaintiff's Counsel]: And protect you. We don't have a statement that we will arrest him tomorrow
. . . .

The majority acknowledges this point, and disclaims any intent to hold that the victim here was given any express assurance of protection. Instead, the majority states, Detective Korterud is responsible for creating a simple, narrowly defined duty to refer the case to the prosecution as promised. Thus, the majority claims, Detective Korterud

was obligated to either perform as promised or to withdraw that promise so that Shelley could "consider her other options."

The victim's estate is not suing Anacortes in order to enforce a supposed promise by the police to make a formal charging referral to the prosecutor. Rather, it is suing for damages because the victim was not provided with protection against her homicidally violent husband. The practical effect of the majority's opinion is to expand the express assurances exception to the public duty doctrine to encompass any promise which, if acted upon, might theoretically provide some measure of protection to a victim. Such a dramatic expansion finds no support in the case law and seriously undermines the public duty doctrine itself. The plaintiff was quite truthful in recognizing the realities of her case and arguing that the public duty doctrine has outlived its usefulness and should be nullified. This court should be equally forthright in acknowledging that only our Supreme Court has that prerogative.

Moreover, assuming that there was an express and enforceable promise under the facts and circumstances of this case, a breach of such a promise would not necessarily lead to a recovery by the plaintiff. In order to recover, Torres must show not only the existence of a duty and breach thereof, but also that the breach was the proximate cause of the injury.[2] I do not think that a jury can find proximate cause here when presented with the four issues it must consider in order to dispose of this case, namely: (1) If the discussion that took place constitutes a formal "referral for a charging decision"; (2) If the prosecutor's office would likely have then made a decision to charge Mike McGuffey; (3) If the prosecutor's office would likely have acted upon such a decision within the month; and (4) If Mike McGuffey would have been arrested *and* remained in custody pretrial, so that this murder would not have occurred within the month. This tragic murder might well have occurred even if Detective Korterud had not "breached" the duty

---

[2]*Hansen v. Friend*, 118 Wn.2d 476, 479, 824 P.2d 483 (1992).

imposed by the majority. Because proximate cause is too remote, this case does not present a cause of action that survives summary judgment.

In addition, the law requires justifiable reliance by a victim before any breach becomes actionable. Here, no reliance was claimed or argued by the plaintiff. The majority ignores that omission, and surmises that the jury could find justifiable reliance because the victim remained in Anacortes, going about her normal life, without consideration of "her other options." Yet the record is totally devoid of any evidence that the victim, in remaining in Anacortes, did so in reliance upon her interaction with the Detective. Because justifiable reliance is not present here, this cause of action cannot survive summary judgment.

I agree that the public duty doctrine has been the subject of much criticism and that it may be an anachronism due to the dramatic social and economic changes which have taken place since the origin of the doctrine during the nineteenth century.[3] Nevertheless, our Supreme Court has had a plethora of opportunities to do away with the doctrine and has not done so. In fact, the public duty doctrine was recently reaffirmed in *Beal v. City of Seattle*.[4] We are bound by that decision and cannot eviscerate the public duty doctrine by so greatly expanding the express assurances exception.

Review denied at 140 Wn.2d 1007 (2000).

---

[3]*Beal v. City of Seattle*, 134 Wn.2d 769, 793-94, 954 P.2d 237 (1998) (Talmadge, J., dissenting).

[4]134 Wn.2d 769, 954 P.2d 237 (1998).