[No. 24102-1-II.   Division Two.   August 4, 2000.]

JAMES C. BABCOCK, ET AL., *Appellants*, v. MASON COUNTY FIRE DISTRICT NO. 6, ET AL., *Respondents*.

---

[7] Civil commitment proceedings may still be instituted against Bratz, if appropriate.

Rogers S. Wilson (of R.S. Wilson, Inc., P.S.), for appellants.

William T. Cornell (of Cornell Paris & Dean), for respondents.

HUNT, J. — James and Kiyoko Babcock appeal the trial court's summary judgment dismissal of their lawsuit against Mason County Fire District No. 6, in which they alleged negligence in: fire fighting strategy, prohibiting their entry into burning structures to remove personal property, allocating fire fighting resources, and hiring of fire fighting personnel. Holding that the Babcocks failed to demonstrate that the District owed them a special duty different from the District's public duty, we affirm.

## FACTS

Around 4:00 P.M. on August 3, 1995, James and Kiyoko Babcock left their home in Union, Washington, to purchase groceries in Shelton. While they were gone, their house caught fire; a neighbor reported it at 5:07 P.M.

Harold Silver, Chief of volunteer Mason County Fire

District No. 6,[1] responded at 5:14 P.M. He observed flames coming up and over the home's roof and the fire having spread to the interior of the adjacent garage.[2] He notified the dispatcher that the fire was well under way, was burning through the structure, and that additional units and water tenders were needed. The dispatcher issued a second alarm, which brought additional units from District No. 6 and other local districts.

Chief Silver donned his fire gear and asked the neighbors if anyone was in the burning mobile home. The neighbors responded that no one was home, but that the Babcocks' dog was inside. Silver prevented them from entering to save the dog because it was too dangerous: The fire, burning very hotly, had "already burned through the roof." Next, Engine 62 arrived with one fire fighter aboard, and Engine 61, with three veteran volunteers, Dan Hess, Andy Graham, and Ed Nelson. As they pulled into the Babcocks' driveway, Hess could see a large black cloud of smoke. As the Babcocks' home and garage came into view, Hess saw that the home was engulfed in smoke and flames and that the fire had spread to the garage. When Hess arrived, there were only four fire fighters on the scene, and they had only 2,000 gallons of water between the two engines.

Having assessed the fire and the available fire fighting capability, Silver directed the effort to contain the fire to the home and garage and to prevent its spread to surrounding vegetation and neighbors' homes.[3] Silver knew that such

---

[1] District No. 6 is located in a rural Mason County community with few or no fire hydrants; thus, it relies on water transporting tenders to support fire fighting efforts. It is staffed by volunteer fire fighters, except for the Chief, who is the sole, paid employee.

[2] The adjacent garage/shop was "a 24 foot by 36 foot wooden structure on a concrete pad, was located at the southeast corner of the house and was separated from it by approximately 10 feet." James Babcock disputes that the garage was burning. Fire fighter Dan Hess corroborated the garage fire in his affidavit. Hess also stated that he noticed the wind was blowing fire from the burning home toward the garage.

[3] Silver decided that Engine 61 would be the main attack engine, while Engine 62 would provide support by connecting its water supply to Engine 61. Hess and Graham were the district's most experienced fire fighters; Engine 61 was "almost

containment would be difficult because "it was hot," "it was August," "the surrounding vegetation was dry," and the wind was blowing, having "already blown the fire into the adjacent garage, . . . setting it alight."

Silver directed Hess and Graham to fight the garage fire, and Nelson to cool the home's wall facing the fire equipment and garage. Because there was a shortage of fire fighters, Silver climbed aboard Engine 61 to operate the water pumps; to protect Hess and Graham, he sprayed the available 500 gallons of water on the side of the mobile home facing the garage.

The garage contained "drums (like oil drums)," oxyacetylene welding equipment, a "solvent tank/parts washer," and other containers holding unknown substances. The rafters, floor, walls, and the substance in the solvent tank/parts washer were burning. Hess knew that the explosives, chemicals, and solvents would increase the risk to the fire fighters. Hess and Graham began fighting the fire, but the large overhead garage door came off its track and fell on Graham, raising questions about the structure's integrity. Hess, as the senior officer, then ordered Graham out of the garage and reported his observations to Silver, who ordered Hess and Graham not to enter the garage without authorization.

At 5:28 P.M., a tender arrived with additional water, followed by more units. After Hess and Graham exited the garage, Silver ordered them to fight the fire from the back or side of the garage; he assigned another team to fight the fire from the front. But Hess and Graham were unable to follow Silver's orders because a large fuel tank was located behind the garage, and the tank could have ignited.

Silver then instructed Hess and Graham to fight the fire from the front of the garage, but not to enter it.[4] But the welding tanks and ammunition stored in the garage began

20 years newer than Engine 62"; and Engine 61's pumps were rated at 1,500 gallons per minute (gpm), while Engine 62's were rated at 1,000 gpm. The Babcocks' expert witness questioned Silver's strategic decision.

[4] Hess estimated this entire sequence took approximately 15 to 20 minutes

to explode and forced the fire fighters to retreat to avoid injury. The fire was successfully confined to the home and the garage; no fire fighters were seriously injured.

The Babcocks returned home around 5:15 P.M. James Babcock contends that one fire fighter instructed him not to remove any personal property and to leave matters in the hands of the fire fighters, who would "take care of protecting [the Babcocks'] property." His wife twice asked a fire fighter to spray water on the garage before it caught fire, but was told they could not because they were waiting for public utility district personnel to arrive and turn off the power. Babcock asserts:

> The firefighters stood around until the garage caught fire and was 3/4 consumed before they put the first drop of water on it. My tent trailer caught fire 20 minutes after our arrival from Shelton and it could have been moved by a single person . . . [a] fireman stood next to it, and for a long while sat on the tongue of it, until just before it caught fire. If they had moved it another ten to fifteen feet, it could have been saved.

Fearing he would lose his 1993 Dodge truck, parked about 20 feet from the house, Babcock moved it without the fire fighters' permission. The heat had already damaged the truck's grill. Babcock further asserts that if he had been allowed into his garage, he, his wife, and neighbors could have saved most of the property within, but that he "relied on the statement of the firemen that the firefighters would protect my property and they did not do that."

Moreover, the Babcocks dispute the severity of the fire, question the fire district's efforts to fight it, and contest the reasonableness of Silver's refusal to move the tent trailer away from the fire.[5] According to Silver: (1) in District No. 6, the fire chief on the scene is in control of the fire; (2) it is

---

because he did not have to replace his oxygen tank, which usually lasted him 15 to 20 minutes. The tank can last 10-30 minutes depending on the level of physical exertion, air temperature, the fire fighter's proximity to the fire, and his or her size and gender.

[5] Silver explained why he did not move the trailer: (1) it would have required sending two fire fighters "that were fully bunkered, and with some protection due to the radiant heat from the structure"; (2) the tent trailer was located next to the

standard procedure to keep citizens away from burning structures; (3) had Babcock asked to move the tent trailer or to remove property from the garage, Silver would have said "no"; (4) the homeowner can disregard what the chief says and "do whatever they want";[6] and (5) Silver told the Babcocks that "due to safety concerns, we don't want you close to the building."

The Babcocks sued District No. 6 and its Commissioners. They alleged: (1) Chief Silver was negligent in delaying deployment of equipment, failing to use the District's personnel and resources effectively to fight the fire, and allowing the Babcocks' shop to catch fire "while crews stood idly by"; and (2) the Commissioners were negligent in hiring Silver and failing to manage and employ "the resources of the district" properly. The Babcocks sought damages for loss of income and personal property, costs, emotional suffering, and "other special damages occasioned by defendants [sic] breach of duty." The trial court granted District No. 6's motion for summary judgment.

## ANALYSIS

### I. STANDARD OF REVIEW

■ When reviewing a trial court's ruling on a motion for summary judgment, we review the record de novo. We will uphold the trial court's judgment if the pleadings, affidavits, depositions and admissions on file demonstrate that there is no genuine issue as to any material fact and the party bringing the motion is entitled to judgment as a matter of law.

*Keates v. City of Vancouver*, 73 Wn. App. 257, 263, 869 P.2d 88 (1994) (quotations and citations omitted).

home, which was burning, and (3) he did not know how heavy the trailer was. Furthermore, Silver was short fire fighters and the arriving tenders were stationed on the main roadway, approximately 500 yards from the Babcock's residence, with one person aboard each, who, according to the District's procedures, is required to remain with the unit.

[6] It is a gross misdemeanor for anyone to disobey the lawful command of a fire chief in charge of a fire-fighting scene. RCW 9A.76.020(3); UNIFORM FIRE CODE § 104.1.2 (1997), as adopted by RCW 19.27.031(3).

■ A motion for summary judgment should be granted if " 'there is no genuine issue of material fact or if reasonable minds could reach only one conclusion on that issue based upon the evidence construed in the light most favorable to the nonmoving party.' " *Keates*, 73 Wn. App. at 263 (quoting *Weatherbee v. Gustafson*, 64 Wn. App. 128, 131, 822 P.2d 1257 (1992)). Applying this standard to the trial court's grant of summary judgment in this case, we affirm.

## II. Public Duty Doctrine

■■ RCW 4.96.010, which abolished sovereign immunity, is qualified by the public duty doctrine. *Smith v. State*, 59 Wn. App. 808, 812, 802 P.2d 133 (1990). "The policy underlying the public duty doctrine is that legislative enactments for the public welfare should not be discouraged by subjecting a governmental entity to unlimited liability." *Taylor v. Stevens County*, 111 Wn.2d 159, 170, 759 P.2d 447 (1988) (citing *Rogers v. City of Toppenish*, 23 Wn. App. 554, 559, 596 P.2d 1096 (1979)). "Traditionally state and municipal laws impose duties owed to the public as a whole and not to particular individuals." *Meaney v. Dodd*, 111 Wn.2d 174, 178, 759 P.2d 455 (1988) (citing *Chambers-Castanes v. King County*, 100 Wn.2d 275, 284, 669 P.2d 451 (1983); *Baerlein v. State*, 92 Wn.2d 229, 231, 595 P.2d 930 (1979)). Therefore, for an individual to recover " 'from a municipal corporation in tort,' " a plaintiff must show that the duty is " 'owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general . . . .' " *Meaney*, 111 Wn.2d at 178 (citing *Bailey v. Town of Forks*, 108 Wn.2d 262, 265, 737 P.2d 1257 (1987)).

■ The Babcocks claim two exceptions to the public duty doctrine: (1) the rescue doctrine, which applies "when governmental agents fail to exercise reasonable care after assuming a duty to warn or come to the aid of a particular person";[7] and/or (2) the special relationship doctrine, which

---

[7] *Moore v. Wayman*, 85 Wn. App. 710, 718, 934 P.2d 707 (1997) (citing *Bailey*, 108 Wn.2d at 268).

applies "where a relationship exists between the governmental agent and any reasonably foreseeable plaintiff, setting the injured plaintiff off from the general public and the plaintiff relies on explicit assurances given by the agent or assurances inherent in a duty vested in a governmental entity."[8]

Here, even taking the facts in the light most favorable to the Babcocks, they cannot sustain their claim that the Fire District engaged in a gratuitous rescue or that the District owed them a special duty.

## A. RESCUE EXCEPTION

First, we assume the Babcocks' assertion to be true, that a fire fighter prevented their salvaging personal property and assured them that the fire district would save it. Even so, contrary to the Babcocks' contention, these allegations do not fall within the rescue exception to the public duty doctrine. The rescue exception is

> based on the tort theory that if one undertakes to render aid to another or to warn a person in danger, one must exercise reasonable care. If a rescuer fails to exercise care and increases the risk of harm to those he is trying to rescue, he is liable for any damages he causes.

Smith, 59 Wn. App. at 814 (citing *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 299, 545 P.2d 13 (1975)).[9] Integral to this exception is that the rescuer, including a state agent, *gratuitously* assumes the duty to warn the endangered parties of the danger and breaches this duty by failing to warn them. *Smith*, 59 Wn. App. at 814.

---

[8] *Moore*, 85 Wn. App. at 718 (citing *Bailey*, 108 Wn.2d at 268).

[9] The plaintiffs in *Brown* sued the State over a failure to warn them about dangerous avalanche conditions after the State received notice of the dangers. The plaintiffs sought recovery for loss of life and destruction of their cabins by an avalanche. 86 Wn.2d at 294. Based on hypothetical facts, an avalanche expert warned a member of the state Real Estate division that the plaintiffs' cabins were in a high risk avalanche area, and the agent "responded in a manner which led [the expert] justifiably to believe that the division would deal with the matter and convey [the expert's] warning to [the plaintiffs], causing [the expert] to refrain from taking further action to warn [the plaintiffs] himself." 86 Wn.2d at 298.

■ Here, the District did not *gratuitously* assume fighting the Babcocks' house fire. Rather, the District was established for this very purpose—to fight fires and to protect the property of *all* citizens, including, but not limited to, the Babcocks. RCW 52.02.020.[10] Moreover, even if the District had gratuitously assumed a duty to warn, nothing in the record suggests that the District failed to warn the Babcocks of the danger. On the contrary, the Babcocks complain that the Chief's warning about the fire danger prevented them from salvaging personal property from the garage and from saving the tent trailer.

We agree with the trial court's characterization of the Babcocks' untenable claim:

> [W]hat [the Babcocks] [are] asking the Court to do is say that as soon as [the firefighting] equipment gets on the road and arrives at a specific location where a fire is taking place, then at that point the rescue doctrine will take the actions of the firefighters outside of the public duty doctrine. And if this were so, the exception would swallow up the rule and there would be no public duty exception for fire companies.

Viewing the evidence in the light most favorable to the Babcocks, no reasonable person would reach the conclusion that District No. 6 gratuitously fought the fire. Rather, District No. 6 is statutorily mandated to do so. RCW 52.02.020. Consequently, the trial court did not err in finding no material issue of fact; and the rescue exception does not apply.

### B. SPECIAL RELATIONSHIP EXCEPTION

■■ Nor have the Babcocks established a special relationship exception to the public duty doctrine. The special relationship exception is a " 'focusing tool' used to determine whether a local government 'is under a general duty

---

[10] RCW 52.02.020 states in pertinent part: "Fire protection districts for the provision of fire prevention services, fire suppression services, emergency medical services, and for the protection of life and property . . . are authorized to be established as provided in this title."

to a nebulous public or whether that duty has focused on the claimant.' " *Taylor*, 111 Wn.2d at 166 (quoting *J&B Dev. Co. v. King County*, 100 Wn.2d 299, 304-05, 669 P.2d 468 (1983), *overruled on other grounds by Taylor*, 111 Wn.2d at 168; *Meaney*, 111 Wn.2d at 180 (footnote omitted)).

The Washington Supreme Court recently addressed this exception in *Beal v. City of Seattle*, 134 Wn.2d 769, 954 P.2d 237 (1998), holding that a municipality could be liable to an individual

> where a relationship exists or has developed between the plaintiff and the municipality's agents giving rise to a duty to perform a mandated act for the benefit of a particular person or class of persons.

*Id.*, 134 Wn.2d at 784-85 (citing *Chambers-Castanes*, 100 Wn.2d at 285).

Three prerequisites must be met to establish a special relationship:

> (1) [T]here is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives rise to justifiable reliance on the part of the plaintiff.

*Id.* at 785 (quoting *Taylor*, 111 Wn.2d at 166). When the plaintiff meets these prerequisites, the government "owes the plaintiff a duty of due care . . . ." *Moore v. Wayman*, 85 Wn. App. 710, 718, 934 P.2d 707 (1997) (quoting *Meaney*, 111 Wn.2d at 179). Further, "[t]he special relationship exception is a narrow one which requires the plaintiff to have relied on assurances he specifically sought and which the government expressly gave." *Pepper v. J.J. Welcome Constr. Co.*, 73 Wn. App. 523, 534-35, 871 P.2d 601 (1994).[11]

[11] District No. 6 maintains that (1) the Babcocks have failed to meet these requirements; (2) the Babcocks have failed to present admissible evidence of any particularized relationship between them and District No. 6; (3) District No. 6 did not make any express assurances to the Babcocks, nor did the Babcocks justifiably rely on such promises. The Babcocks contend that their affidavits demonstrate that a genuine issue of material fact exists as to whether they met the three prerequisites to establish a special relationship with District No. 6.

### 1. No Private Privity with Fire District

■ To satisfy the first prong of the special relationship exception, the Babcocks must demonstrate that they had some form of privity between District No. 6 and themselves that "sets [them] apart from the general public." *Chambers-Castanes*, 100 Wn.2d at 286 (citation omitted).[12] James Babcock asserts in his affidavit that a fire fighter told him the fire fighters would "take care of protecting our property." The Babcocks cite *Chambers-Castanes* for the principle that "privity is used in the broad sense of the word and refers to the relationship between the police department and any 'reasonably foreseeable plaintiff'." 100 Wn.2d at 286 (citations and footnote omitted); they then argue that their interaction with the fire fighter satisfies the privity prong. We disagree.

If we were to read *Chambers-Castanes'* definition of "privity" as broadly as the Babcocks urge, a fire district could be liable any time a fire fighter reassures or orders a homeowner to stay back from a house fire, contrary to the fire code. Under the Uniform Fire Code,[13] it is the fire chief's duty to take control of a fire, to protect life, and to prevent bystanders from entering dangerous situations; it is the public's duty, including the homeowner, to obey the fire chief's orders.

Although we disagree with the trial court's ruling that the special relationship exception applies, we agree with the trial court that it is contrary to public policy to allow a fire victim to construe such admonition as a guarantee of personal safety or property preservation, regardless of the

---

[12] *Chambers-Castanes* held that privity was demonstrated by a police tape transcript "which contains statements by the dispatchers to [the plaintiff] assuring her help was on the way," after the plaintiff's husband was severely beaten by two men while stopped for a traffic light. *Chambers-Castanes*, 100 Wn.2d at 287, 278. The plaintiff and other observers notified the King County Police Department—the Department received a total of 11 calls for assistance from the time of the beatings until the police arrived approximately one hour and twenty minutes later. 100 Wn.2d at 278.

[13] Washington has adopted the Uniform Fire Code (1997). RCW 19.27.031(3); WAC 51-44-003.

unreasonableness of such assumption.[14] In *Chambers-Castanes*, the police made a specific representation in response to a 911 call from a specific assault victim—that help was on the way; yet the police unreasonably delayed their arrival. Here, the fire fighters were reasonably fulfilling a paramount District *public* policy—to keep bystanders safe during a fire.[15]

Taking the facts in the light most favorable to the Babcocks, we hold that they have not established special privity with the District that differs from its general relationship to any other fire victim.

### 2. No Express Assurance by Fire Fighters or Justifiable Reliance by Babcocks

■ Even if there were privity between the District and the Babcocks, the special relationship exception would fail because, under the circumstances, it was unreasonable for the Babcocks to treat the fire fighter's statement as an express assurance that the District would salvage their personal property; nor did the Babcocks justifiably rely on the statement. Rather, the statement was clearly made to advance a primary public duty of the District—to protect human life. RCW 52.02.020; Uniform Fire Code § 104.1 (1997).

The affidavits demonstrate that the fire fighters acted consistently with District No. 6 policy by preventing James Babcock, his wife, and neighbors from entering a potentially explosive environment. The garage contained known flammable and explosive substances. The fire was so hot that it melted the plastic lenses, blistered the paint on Engine 61, and damaged the grill on the Babcocks' truck,

---

[14] *See Rood Utils., Inc. v. City of Auburn*, 233 A.D.2d 873, 649 N.Y.S.2d 291, 292 (1996) (holding that as a matter of law, statements made by fire fighters during course of fighting fire do not rise to the level of reassurance sufficient to establish a special duty or relationship).

[15] Silver admitted at his deposition that one of his responsibilities as a fire fighter and the Chief was to keep people back from the property involved in a structure fire to prevent "another incident added to the incident."

which was parked farther from the fire than was the tent trailer. The fire fighters acted to protect the lives of both the bystanders and themselves, thereby preventing "another incident added to the incident."

Fires are by their nature unpredictable, and August 3, 1995, was hot, dry, and windy. Assuming the fire fighter stated that she would protect the Babcocks' property, a reasonable person could not justifiably rely on that statement as a guarantee that the fire fighters would salvage the property regardless of the fire and wind. *See Torres v. City of Anacortes*, 97 Wn. App. 64, 76, 981 P.2d 891 (1999). Moreover, after Babcock watched the fire consume the tent trailer, he ignored the fire fighter's alleged "assurance," disobeyed the fire fighter's explicit order, and moved his truck.

Other jurisdictions have held that statements made during the course of fighting a fire cannot be used to establish reliance and, therefore, a special relationship.[16] We find persuasive the Arizona Court of Appeals' decision in a similar situation. In *Barnum v. Rural Fire Protection Co.*, 24 Ariz. App. 233, 537 P.2d 618 (1975), a private fire fighting corporation fought a fire, for which it had no legal obligation. *Id.* 537 P.2d at 621. Although Barnum did not contract with Rural for fire protection, the Rural Fire Protection Company responded to a fire at the plaintiff's business. *Id.* Barnum arrived several minutes after the fire fighters. He asserted that (1) there were no flames present at his store for 20 to 40 minutes after he arrived; (2) he could have removed the products from his store, thereby minimizing his loss; but (3) a sheriff's deputy and Rural's fire fighters prevented him from entering his store. 537 P.2d at 620. The

---

[16] *See Dahlheimer v. City of Dayton*, 441 N.W.2d 534 (Minn. Ct. App. 1989) (holding plaintiff's alleged reliance on deputy fire chief's statements that fire department would try to save plaintiff's wood was not reasonable); *Messineo v. City of Amsterdam*, 17 N.Y.2d 525, 215 N.E.2d 163, 267 N.Y.S.2d 905 (1966) (citations omitted) (plaintiff alleged the fire department responded to a call to his home, extinguished a fire, told the plaintiff the fire was extinguished, and five hours later, the fire broke out again, completely destroying his home. The court found no liability because the municipality was not liable for a failure to supply general police or fire protection).

court held that: (1) Barnum could not establish reliance, a necessary prerequisite to tort liability for a volunteer; and (2) the fire fighter's statement that prevented Barnum from entering his store was lawfully made under Arizona's statute against interference with a fire fighter.[17] *Id.* at 623-24.

Similarly, Babcock asserts that a fire fighter told him not to enter his garage. The fire fighter's order to prevent Babcock from entering the structure was lawful.[18] Under RCW 9A.76.020:

> (1) A person is guilty of obstructing a law enforcement officer if the person willfully hinders, delays, or obstructs any law enforcement officer in the discharge of his or her official powers or duties.
>
> (2) "Law enforcement officer" means . . . other public officers who are responsible for enforcement of fire . . . codes.[19]

---

[17] ARIZ. REV. STAT. § 13-944 provides:

§ 13-944. Disobedience or interference with officer or fireman at fire; punishment

A person who, at the burning of a building, disobeys the lawful orders of a peace officer or fireman, or offers resistance to, or interferes with the lawful efforts of a fireman or company of firemen to extinguish the fire, or engages in disorderly conduct calculated to prevent the fire from being extinguished, or who forbids, prevents or dissuades others from assisting in extinguishing the fire, is guilty of a misdemeanor.

*Barnum*, 537 P.2d at 623-24 n.2.

[18] Moreover, UNIFORM FIRE CODE § 104.1.2 (1997) (prohibiting interference with fire fighter operations and mandating that "[l]awful commands of the chief or officer of the fire department . . . shall not be disobeyed") is adopted by reference in RCW 19.27.031(3).

[19] Section 104.1 of the UNIFORM FIRE CODE states:

The chief or officer of the fire department in charge at the scene of a fire or other emergency involving the protection of life or property . . . shall have the authority to direct such operation as necessary to extinguish or control any fire . . . or other hazardous conditions or situations or of taking any other action necessary in the reasonable performance of duty. In the exercise of such power, the chief is authorized to prohibit any person, vehicle, vessel or thing from approaching the scene and is authorized to remove or cause to be removed or kept away from the scene any vehicle, vessel or thing which could impede or interfere with the operations of the fire department and, in the judgment of the chief, any person

(3) Obstructing a law enforcement officer is a gross misdemeanor.

Although justifiable reliance is generally not determined on summary judgment, *Beal*, 134 Wn.2d at 786-87, here, it is clear that Babcock neither factually nor legally relied upon the fire fighter's alleged assurance. As in *Barnum*, we hold that "there is no duty of care imposed upon a sheriff or fireman making a lawful no-entry order" under a statute. *See Barnum*, 537 P.2d at 624. Neither a reasonable person nor the Babcocks could justifiably expect that a fire department would save their property in the face of an unpredictable fire, an initially inadequate water supply, and few fire fighters working in a remote, rural area.

Moreover, the fire fighter's order that the Babcocks stay out of the garage was lawful. The Babcocks chose whether to obey this lawful order or to face criminal sanction: As for entering the garage, the Babcocks chose to obey and to stay safe; with regard to moving the truck, Babcock chose to disobey, thereby risking injury in the melting heat. Under these facts, the Babcocks cannot selectively claim reliance on the fire fighter's order to stay back away from the fire and the danger.

Because we hold that the Fire District owed no special duty to the Babcocks different from the general duty owed to the public at large, we need not address the Babcocks' remaining arguments.

## CONCLUSION

Viewing the evidence and reasonable inferences in the light most favorable to the Babcocks, we hold that the special relationship exception does not apply. Accordingly,

---

not actually and usefully employed in the extinguishing of such fire or in the preservation of property in the vicinity thereof.
Uniform Fire Code, at 1-3-4 (1997).

we affirm the trial court's summary judgment[20] in favor of District No. 6.

ARMSTRONG, C.J., and BRIDGEWATER, J., concur.

Review granted 142 Wn.2d 1016 (2001).

---

[20] We disagree with the trial court's finding that the special relationship exception applied, but we affirm on other grounds. *Nast v. Michels*, 107 Wn.2d 300, 308, 730 P.2d 54 (1986) (citing *Reed v. Streib*, 65 Wn.2d 700, 709, 399 P.2d 338 (1965) (appellate court may affirm trial court on any correct ground, even if not considered by the trial court)).