30 P.3d 1261 (2001)
144 Wash.2d 774
James C. BABCOCK and Kiyoko Babcock, Husband and Wife, Individually, and the Marital Community Thereof, Petitioners,
v.
MASON COUNTY FIRE DISTRICT NO. 6, a Municipal Corporation, and Barbara Bodin, Robert Close and Dwane Ehrich, the Commissioners, thereof, Respondents.
No. 70158-0.
Supreme Court of Washington, En Banc.
Argued May 8, 2001.
Decided September 13, 2001.
*1263 Foster, Pepper & Shefelman, Peter Stephen DiJulio, Seattle, Perkins, Coie, James P. McNeill, III, Spokane, Amicus Curiae on Behalf of Washington State Association of Firefighters.
Rogers Wilson, Tacoma, for Petitioner.
William Thomas Cornell, Bellevue, for Respondent.
*1262 SMITH, J.
Petitioners James C. Babcock and Kiyoko Babcock seek review of a decision of the Court of Appeals, Division Two, which affirmed an order of summary judgment by the Mason County Superior Court in favor of Mason County Fire District Number 6 and its Commissioners in an action for negligence filed by Petitioners based upon actions by the Mason County Fire District while fighting a fire at Petitioners' home.[1] We granted review. We affirm.

QUESTION PRESENTED
The question presented in this case is whether a special relationship existed between Petitioners Babcock and Respondent Mason County Fire District Number 6 which *1264 constituted an exception to the "public duty doctrine" which otherwise provides immunity to fire fighters in the performance of their duties.

STATEMENT OF FACTS
Petitioners' claim arose from a fire at their home in Union, Washington to which Mason County Fire District Number 6 responded.[2] The facts recited are based substantially upon affidavits submitted in the summary judgment proceeding.[3]
On August 3, 1995 at 5:07 p.m. Petitioners' next door neighbor, Ms. Marilyn Sherman, telephoned 911 to report a fire at Petitioners' 40 foot long mobile home at East 471 Hyland Drive in Union, Washington.[4] Petitioners were away shopping for groceries at the time.[5] Fire Chief Harold A. Silver, the first fire fighter on the scene, arrived at 5:14 p.m.[6] He observed heavy smoke and flames coming from the mobile home.[7] He noticed the fire had spread to an adjacent wood frame garage through the open garage door and that the fire was burning inside.[8] Meanwhile a neighbor told Chief Silver that Petitioners' dog was inside the home.[9] The neighbor wanted to go inside to rescue the dog but Chief Silver told him not to.[10]
Chief Silver stated he did not believe the mobile home could be saved because the fire was too intense and well established to be fought.[11] He tried to contain the fire to the mobile home and adjacent garage, but this was difficult because of the hot August day, surrounding dry vegetation, and wind.[12]
According to Chief Silver, Fire Engines 61 and 62 arrived simultaneously at 5:21 p.m.[13] Fire fighters Andy Graham, Dan Hess and Ed Nelson were aboard Fire Engine 61.[14] Fire fighter John Rogers was aboard Fire Engine 62.[15] While Chief Silver and Fire fighters Graham, Hess and Nelson were spraying water on the mobile home, a tent trailer and the garage, Tender 61 arrived with Fire fighters Paul Thomas and Kelly Clark aboard.[16]
After alighting from his truck Fire fighter Hess noticed the wind blowing the fire from the burning mobile home toward the garage.[17] Chief Silver ordered him to enter the garage through the door and to fight the fire from inside.[18] As he and Fire fighter Graham entered the garage he observed what he believed to be oil drums, oxyacetylene welding equipment, a solvent tank/parts washer device and various substances.[19] He knew explosives, chemicals and solvents posed an increased risk to fire fighters in the area.[20] There was fire in the rafters, on the floor in front of him and on the walls to his right.[21] He and Fire fighter Graham began spraying water in the garage.[22] The overhead garage door shortly fell off its tracks landing partially on Mr. Graham.[23] They then went outside *1265 the garage and continued to spray water on the fire through an open door.[24]
The situation inside the garage was reported by Fire fighter Hess to Chief Silver who ordered him to go behind the garage to see if there was another way to attack the fire.[25] It was then that Mr. Hess observed an above-ground fuel oil storage tank with the capacity of several hundred gallons which he believed to be a supply tank for a furnace or heater.[26] He reported to Chief Silver about the oil storage tank. Chief Silver ordered him to continue fighting the fire from an opening in the garage.[27] Ammunition and welding tanks in the garage began exploding soon after that.[28]
While the fire fighters were trying to control the fire, an unidentified person asked permission to move a tent trailer parked between the house and the garage.[29] Fire fighter Hess said the request was denied for several reasons:
To move the trailer would have required pulling a vehicle in between two burning buildings, increasing the risk to fire fighters in the area and involving the risk that the vehicle would also catch on fire and possible [sic] explode, and the driver of any such vehicle would have been put in serious peril. In fact, the fire was so hot that plastic lenses were melted and the paint was blistered on Engine 61, which was much further away from the fire than the tent trailer. Moreover, any vehicle pulling the trailer would have had to drive over fully-charged fire hoses on the ground, with the risk of damaging or rupturing the hoses and endangering the lives of the fire fighters.[[30]]
After about 30 minutes Fire fighters Hess and Graham were replaced on the front line by other fire fighters who arrived on the scene.[31] The fire was brought under control and had not spread to adjacent residences or to the woods. Petitioners' mobile home and garage were destroyed.[32]
Petitioner James Babcock disputed the facts related by the fire fighters. He stated he and his wife returned to their home between 5:15 p.m. and 5:20 p.m.[33] He stated they could see smoke rising from the direction of their home when they were three miles away.[34] He stated that when they arrived at their home he saw one fire truck parked to the left of the home but that no one was fighting the fire.[35] He said he could see flames through the window, but the flames had not broken through the roof or windows.[36] According to Mr. Babcock, the shop (the garage) located approximately 10 feet from his home was not on fire and there was no smoke coming from it.[37] He stated fire fighters Hess and Graham did not begin to fight the fire in the garage immediately upon their arrival because the garage was not on fire at the time.[38] He said that at no time did the fire fighters enter the garage.[39] The garage did not catch fire until approximately 30 minutes after Petitioners arrived home and during that time no water was placed on the garage to stop the fire from spreading to it.[40]
Petitioner James Babcock stated no effort was made to save his tent trailer, about 15 feet from his home, which could easily have been moved by one person.[41] He stated his tent trailer caught fire 20 minutes after he arrived home.[42] Shortly after he arrived, *1266 he attempted to remove an item of personal property when he was told by a "lady fire fighter" that he was not to attempt removal of any of his property.[43] He was told that he and his wife were to leave matters in the hands of the fire fighters and they would "take care of protecting our property."[44] He stated that before the garage caught fire he, his wife and a friend asked the fire fighters to put water on the garage and each time they were told the fire fighters could not do so until the "PUD man" arrived to turn off the electricity.[45]
Even though ordered by the fire fighters not to do so, Petitioner James Babcock nevertheless moved his 1993 Dodge truck which was parked about 20 feet from his home.[46] The grill of the truck had considerable damage from the heat of the fire.[47]
Fire District 6 is located in a rural Mason County community with few or no fire hydrants. It relies upon water-transporting tenders to support its fire fighting. It is staffed by volunteer fire fighters, except for the Chief, who is the sole paid employee. In fighting the fire at the Babcock's home, the fire fighters had to rely upon water pumps and limited-capacity water tanks on the tenders.[48]
On April 28, 1997 Petitioners James and Kiyoko Babcock filed a complaint in the Mason County Superior Court against Respondents claiming negligence,[49] which in summary stated the District Fire Chief negligently delayed dispatch of emergency personnel and equipment by directing the operational equipment to stand by at the station until a late arriving volunteer located his gear, the Fire Chief negligently failed to effectively use personnel and equipment once they were dispatched; their shop was allowed to catch fire with no response at all from fire fighters already on the scene; the Fire Commissioners were negligent in their selection and hiring of the District Fire Chief; volunteer fire fighters were inadequately trained; and the plaintiffs suffered emotional and financial injuries and other damages.[50]
Petitioners asked for damages for loss of personal property; loss of income, costs and other special damages resulting from Respondents' breach of duty; and damages for emotional suffering.[51]
On March 30, 1998 Respondents moved for summary judgment.[52] In their memorandum they argued the court must dismiss Petitioners' claim for outrage because they could not show any conscious disregard of a high probability of severe emotional distress.[53] They also argued Petitioners' negligence claim must be dismissed because they did not demonstrate that Respondents owed them any duty it did not owe to the general public and their claim did not fall under any of the exceptions to the public duty doctrine.[54] On June 25, 1998 Petitioners responded to the motion, stating they did not make a claim for outrage and their negligence claim should not be dismissed because the special relationship exception is established under the facts of this case.[55] On July 1, 1998 Respondents filed a reply brief.[56]
After a hearing on July 30, 1998, the Honorable Toni A. Sheldon granted summary judgment to Respondents.[57]
On August 19, 1998 Petitioner filed a motion for reconsideration.[58] Respondents on *1267 September 29, 1998 then filed a motion in opposition.[59] On October 1, 1998 Petitioners filed a reply.[60] On November 9, 1998 Judge Sheldon denied Petitioners' motion.[61]
On December 4, 1998 Petitioners filed a notice of appeal to the Court of Appeals, Division Two.[62] On August 4, 2000 the Court of Appeals, the Honorable J. Robin Hunt writing, affirmed the judgment of the Superior Court, concluding that:[63]
Viewing the evidence and reasonable inferences in the light most favorable to the Babcocks, we hold that the special relationship exception does not apply. Accordingly, we affirm the trial court's summary judgment in favor of District No. 6.[[64]]
On September 8, 2000 Petitioners Babcock sought review by this court[65] which was granted on January 9, 2001.[66]

DISCUSSION

STANDARD OF REVIEW
"Summary judgment is properly granted when the pleadings, affidavits, depositions, and admissions on file demonstrate there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[67] The moving party bears the burden of demonstrating there is no genuine dispute as to any material fact.[68] The appellate court engages in the same inquiry as the trial court when reviewing an order on summary judgment.[69] All facts and reasonable inferences are considered in a light most favorable to the nonmoving party.[70] All questions of law are reviewed de novo.[71]

PUBLIC DUTY DOCTRINE
The "public duty doctrine" has modified the traditional concept of sovereign immunity. Municipalities are no longer protected by the shield of sovereign immunity.[72] "The threshold determination in a negligence action is whether a duty of care is owed by the defendant to the plaintiff. Whether the defendant is a governmental entity or a private person, to be actionable, the duty must be one owed to the injured plaintiff, and not one owed to the public in general. This basic principle of negligence law is expressed in the `public duty doctrine'."[73]
"Under the public duty doctrine, no liability may be imposed for a public official's negligent conduct unless it is shown that `the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (i.e., a duty to all is a duty to no one).'"[74]
*1268 In enacting RCW 4.96.010 in 1967 the Legislature stated that:
All local governmental entities, whether acting in a governmental or proprietary capacity, shall be liable for damages arising out of their tortious conduct, or the tortious conduct of their past or present officers, employees, or volunteers while performing or in good faith purporting to perform their official duties, to the same extent as if they were a private person or corporation.... [[75]]
To recover from a municipal corporation in tort under the public duty doctrine, a plaintiff must show the duty breached was owed to an individual and was not merely a general obligation owed to the public.[76]
There are four exceptions to the public duty doctrine in which the governmental agency acquires a special duty of care owed to a particular plaintiff or a limited class of potential plaintiffs.[77] These exceptions include (1) legislative intent; (2) failure to enforce; (3) the rescue doctrine; and (4) a special relationship.[78]Only the special relationship exception is at issue in this case.

SPECIAL RELATIONSHIP EXCEPTION
"The special relationship exception is a `focusing tool' used to determine whether a local government `is under a general duty to a nebulous public or whether that duty has focused on the claimant.'"[79] A special relationship arises where "`(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives rise to justifiable reliance on the part of the plaintiff.'"[80]
1. Privity Between the Mason County Fire District and Petitioners Babcock
Petitioners Babcock claim there was privity between them and Respondents because, while the Fire District had a duty to exclude bystanders, it had no duty to make specific assurances to them that their property would be protected.[81] They claim they were not only "reasonably foreseeable plaintiffs" but they also spoke to a fire fighter in person.[82] Petitioners assert that under Chambers-Castanes v. King County[83] it is not necessary to prove repeated promises by a governmental entity in order to establish privity.[84]
Respondents contend the one statement purportedly made by an unidentified fire fighter was not sufficiently detailed to create privity between the single member of the public and the government.[85] The Court of Appeals concluded Petitioners did not establish privity with Respondents that differed from its general relationship to any other fire victim.[86] The court indicated that, unlike in Chambers-Castanes where the police unreasonably delayed their arrival, the firefighters in this case were reasonably fulfilling a Fire District policy to keep bystanders safe during a fire.[87] "The term privity is used in the broad sense of the word and refers to the relationship between the police department [or fire department] and any `reasonably foreseeable plaintiff.'"[88] The direct contact *1269 or privity between the public official and an injured plaintiff must set the injured plaintiff apart from the general public.[89]
In Chambers-Castanes the plaintiff was struck by two men.[90] King County Police operators received 11 calls for assistance from the time of the incident at approximately 5:50 p.m. until they arrived approximately one hour and twenty minutes later.[91] The court concluded there was privity between the King County Department of Public Safety and Mr. and Mrs. Chambers-Castanes from the transcript of a police tape log which contained the words of dispatchers stating that help was on the way.[92] In Beal v. City of Seattle this court also found privity between the 911 emergency operator and the person calling when a 911 operator told the person the police were being sent to assist her.[93]
The Court of Appeals incorrectly concluded privity was not established between Respondents and Petitioners Babcock. In both Chambers-Castanes and Beal the event setting the plaintiffs apart from the general public was a telephone conversation between a government official and a member of the public. In this case Petitioners were even more set apart from the general public than in those cases because the government official, a fire fighter, apparently communicated with them in person at their burning home. As in Chambers-Castanes and Beal, that contact set Petitioners apart from the general public.[94] In both cases privity was found where the dispatchers were fulfilling their duty to the public by answering emergency telephone calls and agreeing to dispatch police officers to the scene. In this case, as in those cases, privity was established by the nature of the contact.
Respondents incorrectly assert that an isolated comment cannot rise to the level of an assurance that would isolate the interests of Petitioners from the interests of every other member of the public. In Beal this court found privity when the contact was a single assurance from one 911 emergency telephone operator to a citizen.[95] In this case privity was established by a single statement by a fire fighter to Petitioner James Babcock, assuming such a communication occurred.[96]
2. Express Assurance to Petitioners
Petitioner James Babcock claims a "lady fire fighter" gave him express assurances when she told him the fire fighters would take care of protecting his property.[97] Petitioners claim this assurance caused them to discontinue their own efforts to save their property.[98] Respondents respond that a single statement by a single unidentified fire fighter does not constitute an express assurance which can bind the Fire District.[99] They contend Petitioners did not claim they requested the Fire District to rescue any particular item of their personal property and that the Fire District never promised it would do so.[100] The Court of Appeals concluded it was unreasonable for Petitioners to treat the fire fighter's statement as express assurance that the District would salvage their personal property.[101]
A governmental authority may be liable to an individual who establishes that a particular duty was owed to that individual *1270 who could justifiably rely upon assurances specifically sought and which the government expressly gave.[102] A government duty cannot arise from implied assurances.[103] "It is only where a direct inquiry is made by an individual and incorrect information is clearly set forth by the government, the government intends that it be relied upon and it is relied upon by the individual to his detriment, that the government may be bound."[104] The plaintiff must seek an express assurance and the government must unequivocally give that assurance.[105]
In Chambers-Castanes this court found express assurances were made when Mrs. Chambers-Castanes telephoned 911.[106] In her first call she stated "[t]his is the fifth call. No one has responded. It's been a half-hour."[107] After she gave a more specific description of her location, the operator said, "[a]ll right, we'll get somebody up there then."[108] When Mrs. Chambers-Castanes called a second time she stated "[w]e need some police here, there shouldn't be any trouble,"[109] to which the operator responded "[w]e have the officer; he is on the way."[110] When she called a third time to ask whether anybody had been dispatched, the operator told her "[y]es, they're on their way ... they'll be there momentarily."[111] When Mrs. Chambers-Castanes told the operator she really needed some assistance, the operator stated "[t]hey'll be there just anytime now. They're on their way."[112]
In Beal express assurances were given to Ms. Melissa Fernandez when a 911 operator told her that police would be dispatched to assist her.[113] She told the operator her estranged husband "had been harassing her and threatening her, and she had been told in order not to break the no contact order she needed `a civil standby' to come out."[114] The operator told her "[w]e'll get the police over there for you okay?"[115]
The Court of Appeals correctly concluded the fire fighter in this case did not give express assurances to Petitioners. Unlike in Chambers-Castanes and Beal in which the citizens specifically sought assurance, Petitioners in this case did not seek any assurance from the fire fighter nor do they claim to have specifically sought such assurance.[116] Unlike the detailed express assurances given by emergency telephone operators in Chambers-Castanes and Beal, the statement made by the fire fighter in this case did not indicate she or the other fire fighters would act in a specific manner.[117] No express assurances were given, even assuming the statement was made as claimed by Petitioners.
3. Justifiable Reliance By Petitioners
Petitioners Babcock contend it was entirely reasonable for them to believe that some of their property could be saved if reasonable efforts had been made.[118] They argue that no determination on reliance should be made without a trial.[119]
*1271 Respondents claim that under the circumstances Petitioners could not justifiably rely on the statement of the unidentified fire fighter as a guaranty that the fire fighters would salvage their property regardless of fire and wind.[120] Respondents assert Petitioners did not change their position for the worse as required under Washington law.[121]
On April 13, 2001 a brief amicis curiae was filed by the Washington State Association of Fire Chiefs and the Washington Fire Commissioners Association. Amici substantially "adopt[ed] the analysis and decision of the Court of Appeals in Babcock, and the analysis and argument of the District contained in the Respondent's [sic] Brief, Respondent's [sic] Answer to Petition Requesting Discretionary Review and the Respondent's [sic] Supplemental Brief."[122] They therefore limited their argument to the public duty doctrine, privity and public policy, arguing essentially that:
The duty to fight fires is a duty to the community, and not a duty to specific persons or property. Therefore, the non-liability rule of the public duty doctrine applies to general statements of reassurance made by fire fighters [including fire chiefs, deputy or assistant fire chiefs, fire marshals, battalion chiefs and other employees of fire protection districts ... with the authority to extinguish fires and protect human life and property] during a fire. Even if there is a potential for liability, such general statements of reassurance do not establish a special relationship exception to the public duty doctrine. Statements of reassurance are made to further the general duty to fight fires and protect lives, and thus, do not constitute "privity" between the governmental entity and the injured plaintiff that sets the later [sic] apart from the general public. This conclusion is consistent with the law in Washington and other jurisdictions. Finally, sound public policy precludes judicial processes from governing a fire scene.[[123]]
The Court of Appeals concluded Petitioners neither factually nor legally relied upon the fire fighter's alleged assurance.[124] The court concluded it was unreasonable for them to rely on the statement as a guaranty that their property would be salvaged regardless of wind and fire.[125] The court indicated that Petitioner Babcock obviously did not rely upon any statement made by the fire fighter because he ignored her comment and order and moved his truck anyway.[126] Whether a party justifiably relies upon information is a question of fact generally not amenable to summary judgment.[127] The court may look to the facts to determine whether the plaintiffs could rely on the assurance.[128] For the government to be bound the plaintiffs must rely upon the assurance to their detriment.[129]
In Beal this court concluded Ms. Fernandez justifiably relied upon the assurance that police protection would be forthcoming because she waited in front of her apartment after being told by the 911 operator that the police were being sent.[130] In this case, viewing the facts most favorably to Petitioners, we conclude they were not justified in relying on the fire fighter's statement to mean their property would be saved.[131] Assuming the garage did not catch fire until 30 minutes *1272 after Petitioners arrived home, as claimed by Petitioners, the fire nevertheless was so intense that plastic lenses were melted, the paint was blistered on a fire engine, and the grill of Petitioners' truck had considerable damage from the heat even though it was parked approximately 20 feet from the burning home.[132] Petitioners acknowledged the day was hot, dry and windy and that fires by their nature are unpredictable.[133]
The Court of Appeals correctly concluded Petitioner James Babcock's actions demonstrated he did not rely upon the fire fighter's statement. Unlike Ms. Fernandez in Beal, whose actions showed she relied on the 911 operator's statement, Petitioner ignored what he claimed to be an assurance by the fire fighter and moved his truck. He did not discontinue his efforts to salvage his property because of the statement made by the fire fighter. Petitioners did not rely to their detriment because there were no reasonably safe alternatives. The only alternative would have been for the fire fighter to allow Petitioners to risk their lives to salvage or save their property. Petitioners did not justifiably rely upon the fire fighter's statement.
Petitioners have not established their right to bring this negligence action against Respondents because Petitioners have not established an express assurance by Respondents which Petitioners justifiably relied upon to their detriment.

SUMMARY AND CONCLUSIONS
Under the "public duty doctrine," to recover from a municipal corporation in tort a plaintiff must show the duty breached was owed to an individual and was not a general obligation owed to the public. There are four exceptions to the public duty doctrine in which the government agency acquires a special duty of care owed to a particular plaintiff or class of plaintiffs. They are (1) legislative intent; (2) failure to enforce; (3) the rescue doctrine; and (4) a special relationship. Only the special relationship exception is at issue in this case which requires the plaintiff to demonstrate privity and express assurances upon which plaintiff justifiably relied.
Petitioners Babcock did establish privity with Respondents which set them apart from the general public by demonstrating that a fire fighter communicated with them in person at their burning home. However, they did not establish that the unidentified fire fighter gave them express assurance that she would save their property. Petitioners did not claim they specifically sought such assurance. They were not justified in relying upon the fire fighter's statement to mean their property would be salvaged or saved despite the intense fire at their home.
The Court of Appeals was correct in affirming the order of the Mason County Superior Court granting summary judgment in favor of Respondents Mason County Fire District Number 6 and its Commissioners.
We affirm the Court of Appeals.
JOHNSON, BRIDGE, and OWENS, JJ., concur.
CHAMBERS, J. (concurring).
However imperfect our system of justice may be, there are certain goals of perfection for which we must strive. Equal justice for all is one of those elusive but desirable goals. We know that all people are not necessarily created equal; some are rich and some are poor, and some are given greater opportunities to develop their natural gifts and talents. The institution of our courts must be the great levelerwhere justice is blind and a pauper and a king are judged by the same standard. In our courts of law every party must be treated equally. It is therefore contrary to the general principles of law that one party be granted a special set of rules not afforded to others. The public duty doctrine is one of those special privileges afforded some parties, which is antithetical to the foundations of our law.
Both the majority and the dissent analyze this case by applying the public duty doctrine and focusing on the exact words used by a fire fighter to determine duty. This approach is too narrow.
The public duty doctrine is unnecessary. The application of general tort principles to determine duty will usually direct us to the *1273 same result. The public duty doctrine injects confusion into the law as it implies that not all parties are to be treated equally. A "special relationship" is the principal exception to the public duty doctrine. The focus of this exception on express assurances and reliance upon those assurances diverts attention from the appropriate policy considerations and from foreseeability to determine if a duty should be owed.
In 1961 our Legislature abandoned sovereign immunity by adopting RCW 4.92.090, which as amended provides:
The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation.
Courts, not the Legislature, legislated the public duty doctrine. The doctrine has been accused of conflicting with the clear intent of the Legislature to abolish sovereign immunity.[1] In fact, this Court did not quickly embrace the public duty doctrine. When this Court first mentioned the public duty doctrine 14 years after the repeal of sovereign immunity, we simply said we have no particular quarrel at this time with the general premise on which public duty doctrine cases rely.[2]
The public duty doctrine has been described as the "duty to no one" doctrine. The premise of the doctrine is that the government has a duty to the public in general and that no duty of care is owed to individuals.[3] The development and growth of the doctrine in this Court is instructive. Like the evolution of many legal rules, the direction of its growth has often been driven by the facts before the court. Initially the public duty doctrine was simply another way of saying the state did not have a duty to everyone.[4] There are four exceptions to the public duty doctrine: clear legislative intent,[5] failure to enforce,[6] rescue doctrine,[7] and special relationship.[8] Over the years, this Court has focused more and more on the special relationship exception.[9] In early building code and inspection cases, this Court granted the exception to classes of people rather than to individuals.[10]
*1274 This Court's focus on the individual as opposed to the class of persons intended to be protected first occurred in a rescue doctrine case. In Chambers-Castanes v. King County, 100 Wash.2d 275, 669 P.2d 451 (1983), this Court, citing cases from other jurisdictions, determined that for a victim to sue a police department for the failure to rescue, there must be (1) some form of privity between the police department and the victim that sets the victim apart from the general public, and (2) explicit assurances of protection that give rise to reliance on the part of the victim. The Chambers-Castanes court went on specifically to say that the assurances need not be explicit as some relationships carry the implicit character of assurance.[11]
In 1988, this Court severely limited the special relationship exception to the public duty doctrine in deciding three cases for loss of profits or damages involving permits and inspections.[12] Under this new mutation of the public duty doctrine, the government is immune unless the plaintiff can show direct contact with the governmental entity and express assurances from the governmental agency upon which the plaintiff justifiably relies. Former claimants who had been successful before this Court, i.e., Mason, Brown, Campbell, J & B Development, and Halvorson, would probably not have been successful under this standard. The express assurance and reliance requirements may have swallowed the "clear legislative intent," "failure to enforce," and "rescue" exceptions to the public duty doctrine.
As a matter of policy, contact with a government agency and reliance upon the government's assurances may be desirable in governmental permit inspection cases. Reliance should be an element of proof to establish loss of profits or monetary damages. Statements by dispatchers and rescuers may be relevant to determine when a rescue has commenced, thereby triggering the duty of the rescuer to exercise ordinary care. However, the application of a mechanical rule will result in harsh and unintended results. Innocent third parties and unconscious victims who cannot show reliance upon assurances will be denied redress contrary to the Legislature's intention. The elements of the special relationship ruledirect contact, express assurances, and justifiable relianceare intrinsically related to a business type of plaintiff such as builders and developers involved in permit applications. Unrelated plaintiffs will not be able to meet the elements because they lack a business relationship with the government. The result is unfortunate because these elements were developed first to determine when police have commenced a rescue, Chambers-Castanes, 100 Wash.2d at 275, 669 P.2d 451, and then applied primarily to prevent economically injured plaintiffs from holding governmental entities liable in tort as insurers against plaintiff's non compliance with codes. Taylor v. Stevens County, 111 Wash.2d 159, 168-70, 759 P.2d 447 (1988).
Many states have either rejected or abandoned the public duty doctrine.[13] In Washington, *1275 Justice Utter was a relentless critic of the public duty doctrine.[14] Many commentators have criticized the public duty doctrine, which one commentator suggested should "follow the doctrine of sovereign immunity into the `dustheap of history.'" Shelly K. Speir, Comment, The Public Duty Doctrine and Municipal Liability for Negligent Administration of Zoning Codes, 20 Seattle U.L.Rev. 803, 803 (1997) (quoting John Cameron McMillan, Jr., Note, Government Liability and the Public Duty Doctrine, 32 Vill. L.Rev. 505, 529 (1987)).
I would, without reversing any of our prior decisions, simply decide this and all future government liability cases based upon traditional tort law analysis.[15] Traditional tort liability analysis focuses on policy, foreseeability of injury, and proximate cause. The advantages of this approach are several. Traditionally tort duty analysis focuses consideration on the policy of whether the government should owe a duty in a given situation. When a government entity performs a function that is not paralleled in the private sector, such as the issuance of permits and inspection of construction, this Court should analyze the policy concerns unique to those public functions. Traditional tort duty analysis focuses on the class of persons intended to be protected as opposed to the relationship between the plaintiff and government entity. Traditional tort analysis applies the same standard of care to all parties, does not perpetuate the state's immunity, does not conflict with the legislative statutes abrogating governmental immunity and furthers our goal of providing equal justice to all parties.
Applying traditional tort law analysis to the instant case leads me to the same result as the majority. Under such analysis, there is no duty to rescue the property of another. However, once a rescue is undertaken, the rescuer must exercise ordinary care. The duty of ordinary care is implicit in the act and is not related to any express statements made by the fire fighters nor is it related to reliance. The Babcocks's claim, in essence, is not that Mason County Fire District No. 6 breached the standard of care in fighting the fire, but that it failed to fight the fire. Specifically the Babcocks argue that for 30 minutes after the arrival of the fire fighters, not one drop of water was placed on the garage to stop the fire from spreading.
The Babcocks's home is in a rural area, which is lightly wooded. Harold Silver is Chief of the Mason County Fire District No. 6, which is a volunteer fire department. Upon arriving at the scene, Chief Silver determined that the Babcocks's mobile home was burning very hotly and had "already burned through the roof." Clerk's Papers (CP) at 136. The neighbors reported that no one was at home, but that the Babcocks's dog was inside. Silver prevented them from entering to save the dog because it was too dangerous. The garage, which was approximately 10 feet from the home, contained drums (like oil drums), oxyacetylene welding equipment, and other containers holding unknown substances, as well as a solvent tank/ parts washer device. Chief Silver concluded that the activities of the fire fighters would be directed toward containing the spread of the fire to the adjacent building, adjacent residences, and woodlands. Applying traditional tort law duty analysis, one would not require a would-be rescuer to risk his or her life to fight a fire, particularly an excessively hot or potentially explosive fire. No public *1276 policy is served by requiring the Mason County Fire District No. 6 to do so.
Next, Babcock argues that he was ordered by fire-fighting personnel not to remove personal property from the area around the fire and that the fire fighters would "take care of protecting our property." CP at 48. Fire districts such as Mason County Fire District No. 6 are authorized, "for the provision of fire prevention services, fire suppression services, emergency medical services, and for the protection of life and property in areas outside of cities and towns." RCW 52.02.020. I agree with the Court of Appeals that the affidavits demonstrate that the fire fighters acted consistent with District No. 6's policy by preventing James Babcock, his wife, and neighbors from entering a potentially explosive environment. The garage contained known flammable and explosive substances. The fire fighters acted to protect the lives of both the bystanders and themselves.

CONCLUSION
In formulating the public duty doctrine, the courts have conflicted with the clear intent of our Legislature to abolish sovereign immunity. The doctrine is unnecessary, and the narrow focus of the special relationship exception, relying as it does on express assurances, leads to tortured analysis that usually arrives at the same result we could achieve by the straightforward application of general tort principles to determine duty. One of the most fundamental precepts of our law is equal justice for all. By implying that not all parties are to be treated equally, the public duty doctrine injects confusion into the law and shakes the foundations of our legal system. Applying traditional tort law analysis to this case leads me to the same result as the majority.
IRELAND, J., concurs.
MADSEN, J. (dissenting).
The majority fails to follow precedent when it concludes as a matter of law that petitioners did not justifiably rely on an assurance by a fire fighter that their property would be protected. This case is legally indistinguishable from Beal v. City of Seattle, 134 Wash.2d 769, 954 P.2d 237 (1998), where this court held that there were material questions of fact remaining as to whether the special relationship exception to the public duty doctrine was satisfied. In concluding to the contrary, the majority has failed to follow the principle that in reviewing a grant of summary judgment, the facts and all reasonable inferences from the facts are considered in the light most favorable to the nonmoving party, here the Babcocks. The Court of Appeals should be reversed. Accordingly, I dissent.
Under the public duty doctrine, recovery in tort is possible in this case only if the Babcocks show that a duty was owed to them and not to the public in general. Beal, 134 Wash.2d at 784, 954 P.2d 237; Taylor v. Stevens County, 111 Wash.2d 159, 163, 759 P.2d 447 (1988); Chambers-Castanes v. King County, 100 Wash.2d 275, 284, 669 P.2d 451 (1983). The special relationship exception to the public duty doctrine provides that liability may exist where "(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives [sic] rise to justifiable reliance on the part of the plaintiff." Taylor, 111 Wash.2d at 166, 759 P.2d 447. The majority finds that the first part of this three-part test is satisfied, but finds the second two parts lacking.
Turning first to the question whether the Babcocks have presented evidence of an assurance by a government official sufficient to overcome summary judgment, it is apparent that they have. Mr. Babcock averred that "shortly after [the Babcocks] first arrived home, I attempted to remove an item of personal property and I was told by a lady fire fighter that I was not to attempt removal of any property. I was told that we were to leave matters in the hands of the fire fighters and they would `take care of protecting our property.'" Clerk's Papers (CP) at 47-48 (Aff. of James Babcock). In a supplemental affidavit, Mr. Babcock gave a physical description of the fire fighter, and explained that the District 6 people were the first to arrive and she was among that group. He repeated in his supplemental affidavit that he had just picked up an item of property when *1277 he spoke to her, and was "just about to move my tent trailer." CP at 17 (Suppl. Aff. of James Babcock). He stated that "when I was told that my property would be protected, I thought that meant my tent trailer, as it was easily accessible, and all of my property which could be saved without undue risk to the firemen." Id. at 18.
The evidence and reasonable inferences from the evidence must be viewed in the light most favorable to the Babcocks. See Beal, 134 Wash.2d at 786, 954 P.2d 237. Mr. Babcock's affidavits, construed most favorably to the Babcocks, sufficiently establish an express assurance by a public official that he should not try to rescue his property which could be safely rescued because the fire fighters would do so. Not only do the express words constitute an assurance, but they do so even more in the context of the fire fighter ordering Mr. Babcock to cease trying to save his property and the fire fighters "would take care" of his property. CP at 48.
The majority reasons, though, that the plaintiff must specifically seek assurance in order for the special relationship exception to the public duty doctrine to apply. The majority reads more into the cases than is there. In Meaney v. Dodd, 111 Wash.2d 174, 179-80, 759 P.2d 455 (1988), the special relationship exception was claimed where government officials were allegedly negligent in failing to gave information relating to compliance with the building code. The court overruled J & B Dev. Co. v. King County, 100 Wash.2d 299, 669 P.2d 468 (1983) and held that in order to maintain an action based upon negligent issuance of a building permit, a direct inquiry must have been made by the plaintiff and incorrect information clearly set forth by the government. Meaney, 111 Wash.2d at 179-80, 759 P.2d 455. In that context, "[t]he burden of compliance with codes, regulations and ordinances remains the responsibility of the applicant. A builder can rely on the county division of land development for accurate information and building permits binding upon the governmental authority if the individual can show that there was a particular duty owed to him and that he could justifiably rely on assurances which he specifically sought and which the government expressly gave." Meaney, 111 Wash.2d at 179, 759 P.2d 455; see Taylor, 111 Wash.2d 159, 759 P.2d 447.
Here, however, the situation is quite different. There is no comparable "burden of compliance" on plaintiffs. The question here is simply whether the government official made an express assurance that the Babcocks could justifiably rely on. Mr. Babcock's affidavits raise a material question of fact as to whether such an assurance was given.
Next, the Babcocks have also presented sufficient evidence that they justifiably relied on the assurance given. Notably, "whether a party justifiably relies on information is a fact question generally not amenable to summary judgment." Beal, 134 Wash.2d at 786-87, 954 P.2d 237; see, e.g., Swanson v. Liquid Air Corp., 118 Wash.2d 512, 518, 826 P.2d 664 (1992). The evidence and reasonable inferences must be viewed in favor of the Babcocks. Mr. Babcock stated that he and his wife returned home about 5:15 to 5:20 p.m., and no one was then fighting the fire. Mr. Babcock said that at that time the garage (or shop) was not on fire and there was no smoke coming from it, that at no time did any fire fighter enter the garage to fight fire, that the garage did not catch fire until "approximately thirty minutes after" the Babcocks arrived, and that "there was no water placed on the garage to stop the fire from spreading to it." CP at 47 (Aff. of James Babcock). Mr. Babcock stated he had a tent trailer "parked about 15 feet from my home. It is a lightweight affair which is easily moved by one person." Id. After Mr. Babcock was told the fire fighters would take care of his property, he refrained from trying to save any of it. He specifically stated that "my tent trailer caught fire 20 minutes after our arrival from Shelton and it could have been moved by a single person.... I would have moved it myself had I not been given the order that I should not touch anything. A fireman stood next to it, and for a long while sat on the tongue of it, until just before it caught fire." Id. at 48. Mr. Babcock then said that "[n]otwithstanding that order, and after my tent trailer caught fire, I was certain I would also lose my 1993 Dodge truck which was parked about 20 feet from my *1278 house.... I moved it without their permission. Even so, considerable heat damage had occurred to the grill and it would have certainly been lost had I not moved it." Id. Mr. Babcock added that he and others at the scene "could have saved most, if not all, of the property in the garage. There were three doors to this garage and I had at least four people, in addition to my wife and myself, to assist in bringing property out." Id. Mr. Babcock stated: "I relied on the statement of the firemen that the fire fighters would protect my property and they did not do that." Id. at 49.
These statements sufficiently establish a material question of fact as to whether the Babcocks justifiably relied on the assurance they were given. Mr. Babcock's affidavit plainly shows that he did rely on the assurance to his detriment because the tent trailer and any property in the garage that could have been saved were lost. His statements also belie the majority's conclusion that he did not rely on the assurance because he "ignored" the fire fighter's statement and went ahead and moved his truck. Majority at 1271. He clearly explains that he took matters into his own hands and saved the truck from destruction only after he saw that nothing was being done despite the assurance given. Moreover, contrary to the majority's conclusion, the facts stated in the affidavit, construed in his favor, show that regardless of the fact it was hot, dry and windy, there was time to safely save some of the propertya fire fighter sat on the tongue of the tent trailer until shortly before it caught fire, Mr. Babcock was able to drive the truck to safety even after delaying some time in response to orders not to try to rescue his property, the garage did not catch fire until 30 minutes after he arrived home, and it had multiple doors through which property could be saved.
This case is like Beal where this court held that there were material questions of fact as to justifiable reliance on an assurance given by a governmental official. Crucial to that decision, as should be true here, the court did not attempt to decide questions of fact on review of summary judgment, but instead applied the elementary rule that facts and the reasonable inferences from the facts are construed in the light most favorable to the nonmoving party. This the majority has failed to do.
I would reverse the Court of Appeals and remand this matter for further proceedings.
ALEXANDER, C.J., and SANDERS, J., concur.
SANDERS, J. (concurring in dissent).
I concur in Justice Madsen's dissent; however, I also concur with Justice Chambers' view that the public duty doctrine should be completely discarded.
NOTES
[1] Babcock v. Mason County Fire Dist. No. 6, 101 Wash.App. 677, 683, 5 P.3d 750 (2000).
[2] Clerk's Papers at 150.
[3] Counsel for Petitioners during oral argument referred to the deposition of Chief Harold A. Silver. The document in the Clerk's Papers is unsigned and Chief Silver did not waive signature. It is therefore not part of the record before us.
[4] Clerk's Papers at 120.
[5] Id. at 46.
[6] Id. at 62, 115, 136.
[7] Id. at 136.
[8] Id.
[9] Id.
[10] Id.
[11] Id. at 137.
[12] Id. at 138.
[13] Id. at 125, 129.
[14] Id. at 138.
[15] Id.
[16] Id. at 139.
[17] Id. at 130.
[18] Id. at 130-31.
[19] Id. at 131.
[20] Id.
[21] Id.
[22] Id.
[23] Id.
[24] Id.
[25] Id. at 132.
[26] Id.
[27] Id.
[28] Id. at 140-41.
[29] Id. at 132.
[30] Id. at 134.
[31] Id.
[32] Id.
[33] Id. at 46.
[34] Id.
[35] Id. at 46.
[36] Id.
[37] Id. at 46-47.
[38] Id. at 47.
[39] Id.
[40] Id.
[41] Id.
[42] Id. at 48.
[43] Id. at 47.
[44] Id. at 47-48.
[45] Id.
[46] Id.
[47] Id.
[48] See Babcock, 101 Wash.App. at 680, 5 P.3d 750.
[49] Clerk's Papers at 159-65.
[50] Id. at 162.
[51] Id.
[52] Id. at 143.
[53] Id. at 85.
[54] Id. at 87-112.
[55] Id. at 51, 56.
[56] Id. at 33.
[57] Order Granting Summary Judgment, Mason County Superior Court, filed April 10, 1998.
[58] Id. at 14.
[59] Id. at 6.
[60] Id. at 2.
[61] Order Denying Plaintiff's Motion for Reconsideration, Mason County Superior Court, filed November 9, 1998.
[62] Notice of Appeal, Court of Appeals, Division Two, filed December 4, 1998.
[63] Babcock 101 Wash.App. at 692-93, 5 P.3d 750.
[64] Id. at 692-93, 5 P.3d 750 (footnote omitted). The Superior Court order on summary judgment included the Fire District and its Commissioners, identified as Respondents before this court.
[65] Petition Requesting Discretionary Review to the Supreme Court, State of Washington, Washington Supreme Court, filed September 8, 2000.
[66] Order, Washington Supreme Court, filed January 9, 2001.
[67] Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998) (citing CR 56(c)).
[68] Folsom, 135 Wash.2d at 663, 958 P.2d 301 (citing Lamon v. McDonnell Douglas Corp., 91 Wash.2d 345, 349, 588 P.2d 1346 (1979)).
[69] Mt. Park Homeowners Ass'n v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994) (citing Syrovy v. Alpine Resources, Inc., 122 Wash.2d 544, 548 n. 3, 859 P.2d 51 (1993)).
[70] Mt. Park Homeowners, 125 Wash.2d at 341, 883 P.2d 1383 (citing Taggart v. State, 118 Wash.2d 195, 199, 822 P.2d 243 (1992); Syrovy, 122 Wash.2d at 548 n. 3, 859 P.2d 51).
[71] Id.
[72] Bailey v. Town of Forks, 108 Wash.2d 262, 737 P.2d 1257 (1987).
[73] Taylor v. Stevens County, 111 Wash.2d 159, 163, 759 P.2d 447 (1988) (citation omitted).
[74] Id. (quoting J & B Dev. Co. v. King County, 100 Wash.2d 299, 303, 669 P.2d 468 (1983), overruled on other grounds by Taylor, 111 Wash.2d at 168, 759 P.2d 447).
[75] RCW 4.96.010(1). See also Bailey, 108 Wash.2d at 265, 737 P.2d 1257.
[76] Beal v. City of Seattle, 134 Wash.2d 769, 784, 954 P.2d 237 (1998) (citing Taylor, 111 Wash.2d at 163, 759 P.2d 447; Chambers-Castanes v. King County, 100 Wash.2d 275, 284, 669 P.2d 451 (1983)).
[77] Bailey, 108 Wash.2d at 268, 737 P.2d 1257.
[78] Id.
[79] Taylor v. Stevens County, 111 Wash.2d at 166, 759 P.2d 447 (quoting J & B Dev. Co., 100 Wash.2d at 304-05, 669 P.2d 468.)
[80] Beal, 134 Wash.2d at 785, 954 P.2d 237 (quoting Taylor, 111 Wash.2d at 166, 759 P.2d 447).
[81] Pet'rs' Suppl. Br. at 13.
[82] Id.
[83] Chambers-Castanes, 100 Wash.2d 275, 669 P.2d 451.
[84] Id. at 14.
[85] Resp'ts' Suppl. Br. at 10.
[86] Babcock, 101 Wash.App. at 689, 5 P.3d 750.
[87] Id. at 689, 5 P.3d 750.
[88] Chambers-Castanes, 100 Wash.2d at 286, 669 P.2d 451 (citing Warren v. Dist. of Columbia, 444 A.2d 1, 10 (D.C.1981)).
[89] Taylor, 111 Wash.2d at 166, 759 P.2d 447.
[90] Chambers-Castanes, 100 Wash.2d at 278, 669 P.2d 451.
[91] Id.
[92] Id. at 287, 669 P.2d 451.
[93] Beal, 134 Wash.2d at 774, 954 P.2d 237.
[94] Petitioner James Babcock claims an otherwise unidentified female fire fighter told him the fire fighters would take care of protecting his property.
[95] Beal, 134 Wash.2d at 774, 954 P.2d 237 (this court concluded a special relationship existed between Ms. Beal and the City of Seattle from one telephone conversation between her and a 911 operator. The operator told her "we're going to send somebody there" and "[w]e'll get the police over there for you okay?").
[96] See id.
[97] Clerk's Papers at 47-48.
[98] Pet'rs' Suppl. Br. at 14.
[99] Resp'ts'Suppl. Br. at 11.
[100] Id. at 12.
[101] Babcock, 101 Wash.App. at 689, 5 P.3d 750.
[102] See Meaney v. Dodd, 111 Wash.2d 174, 179-80, 759 P.2d 455, (1988).
[103] See Honcoop v. State, 111 Wash.2d 182, 192-93, 759 P.2d 1188 (1988); Taylor, 111 Wash.2d at 167, 759 P.2d 447.
[104] Meaney, 111 Wash.2d at 180, 759 P.2d 455.
[105] See id.
[106] Chambers-Castanes, 100 Wash.2d at 287, 669 P.2d 451.
[107] Id. at 279, 669 P.2d 451. This was Mrs. Chambers-Castanes' first call to the 911 operator. Five other persons had called the operator requesting police assistance at the scene of the incident.
[108] Id.
[109] Id.
[110] Id.
[111] Id. at 280, 669 P.2d 451.
[112] Id.
[113] Beal, 134 Wash.2d at 785, 954 P.2d 237.
[114] Id. at 774, 954 P.2d 237.
[115] Id.
[116] Id.
[117] Beal, 134 Wash.2d at 787, 954 P.2d 237 ("[D]uty is defined at least in part by the nature of the assurances given.").
[118] Pet'rs' Suppl. Br. at 15.
[119] Id. at 16. This court may determine the issue of justifiable reliance as a matter of fact without a trial. See Beal, 134 Wash.2d 769, 954 P.2d 237.
[120] Answer to Pet. Requesting Discretionary Review at 6.
[121] Resp'ts' Suppl. Br. at 14.
[122] Br. of Amicis Curiae, at 3 n. 5.
[123] Id. at 2-3.
[124] Babcock, 101 Wash.App. at 692, 5 P.3d 750.
[125] Id. at 690, 5 P.3d 750.
[126] Id.
[127] Beal, 134 Wash.2d at 786, 954 P.2d 237. See also Chambers-Castanes 100 Wash.2d at 287, 669 P.2d 451 in which the court stated, "Reliance also was present, at least for purposes of a CR 12(b)(6) motion, in that reliance was alleged in appellants' amended complaint. Although appellants may have difficulty proving their claims and the damages caused by their alleged reliance, we find the allegations alone are sufficient to withstand a CR 12(b)(6) motion."
[128] Meaney, 111 Wash.2d at 180, 759 P.2d 455.
[129] Id.
[130] Beal, 134 Wash.2d at 786, 954 P.2d 237.
[131] See Meaney, 111 Wash.2d at 180, 759 P.2d 455 (the court may look to the facts of a case to determine whether a plaintiff can rely on an assurance).
[132] See Clerk's Papers at 48.
[133] See Pet'rs' Suppl. Br. at 14.
[1] "By rejecting this approach, the majority's analysis flies in the face of the Legislature's express direction that governmental entities shall be liable in tort `to the same extent as if they were a private person or corporation' ( RCW 4.96.010). This seems to me a rather flagrant exercise of judicial lawmaking in an area where the Legislature has already spoken." Chambers-Castanes v. King County, 100 Wash.2d 275, 291, 669 P.2d 451 (1983) (Utter, J., concurring in the result).
[2] "We have no particular quarrel at this time with the general premise on which the cases relied upon by the City stand, i.e., negligent performance of a governmental or discretionary police power duty enacted for the benefit of the public at large imposes no liability on the part of a municipality running to individual members of the public." Campbell v. City of Bellevue, 85 Wash.2d 1, 9-10, 530 P.2d 234 (1975).
[3] "The traditional rule is that municipal ordinances impose a duty upon municipal officials which is owed to the public as a whole, so that a duty enforceable in tort is not owed to any particular individual." Halvorson v. Dahl, 89 Wash.2d 673, 676, 574 P.2d 1190 (1978).
[4] Campbell, 85 Wash.2d at 9-10, 530 P.2d 234.
[5] Halvorson, 89 Wash.2d at 676-77, 574 P.2d 1190 (occurring when the terms of a legislative enactment evidence an intent to identify and protect a particular and circumscribed class of persons).
[6] Campbell, 85 Wash.2d at 12-13, 530 P.2d 234 (holding governmental agents responsible for enforcing statutory requirements when they possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and the plaintiff is within the class the statute intended to protect).
[7] Brown v. MacPherson's, Inc., 86 Wash.2d 293, 299, 545 P.2d 13 (1975) (imposing liability when governmental agents fail to exercise reasonable are after assuming a duty to warn or come to the aid of a particular plaintiff).
[8] Chambers-Castanes, 100 Wash.2d at 285 n. 3, 669 P.2d 451.
[9] "The majority simply goes too far in permitting the special relationship exception to swallow up the rule of the public duty doctrine. If we wish to eliminate the public duty doctrine in its entirety, we should say so." Beal v. City of Seattle, 134 Wash.2d 769, 794, 954 P.2d 237 (1998) (Talmadge, J., dissenting).
[10] J & B Dev. Co., 100 Wash.2d 299, 307, 669 P.2d 468 (1983) ( "the permit and inspection requirements do not create a duty of care applicable merely to the public in general. Rather, they apply to a limited class of citizens, the builders."); Halvorson, 89 Wash.2d at 676, 574 P.2d 1190 ("Liability can be founded upon a municipal code if that code by its terms evidences a clear intent to identify and protect a particular and circumscribed class of persons."); Campbell, 85 Wash.2d at 13, 530 P.2d 234 (granting an exception to the class that the Bellevue City Code was designed to protect).
[11] Chambers-Castanes, 100 Wash.2d at 286, 669 P.2d 451.
[12] Honcoop v. State, 111 Wash.2d 182, 759 P.2d 1188 (1988); Meaney v. Dodd, 111 Wash.2d 174, 759 P.2d 455 (1988); Taylor v. Stevens County, 111 Wash.2d 159, 759 P.2d 447 (1988).
[13] See, e.g., Adams v. State, 555 P.2d 235, 241 (Alaska 1976) (describing the "duty to all, duty to no-one" doctrine as a form of sovereign immunity); Ryan v. State, 134 Ariz. 308, 656 P.2d 597, 599 (1982) (electing under most circumstances to treat the state like a private litigant because "the parameters of duty owed by the state will ordinarily be coextensive with those owed by others" and calling the distinction between general and specific duty a "speculative exercise"); Martinez v. City of Lakewood, 655 P.2d 1388, 1390 (Colo. Ct.App.1982) (holding that "[t]he concept of a public duty cannot stand either with the enactment of the statute abrogating sovereign immunity, nor in instances where there is a common law duty of a public entity to the plaintiff"); Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1015 (Fla.1979) (characterizing the public duty doctrine as "a function of municipal sovereign immunity and not a traditional negligence concept which has meaning apart from the governmental setting"); Wilson v. Nepstad, 282 N.W.2d 664, 671 (Iowa 1979) (holding that "the abrogation of governmental immunity means the same principles of liability apply to officers and employees of municipalities as to any other tort defendants"); Stewart v. Schmieder, 386 So.2d 1351, 1358 (La.1980) (holding that "the mere fact that a duty is of a public nature, and benefits the general public, does not require a conclusion that the city cannot be found liable for the breach of that duty"); Schear v. Bd. of County Comm'rs, 101 N.M. 671, 687 P.2d 728, 730 (1984) (holding that claims under the Tort Claims Act would be "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty"); Brennen v. City of Eugene, 285 Or. 401, 591 P.2d 719, 725 (1979) (using traditional tort principles to analyze a negligence complaint against the city because "any distinction between `public' and `private' duty is precluded by statute in this state"); Coffey v. City of Milwaukee, 74 Wis.2d 526, 247 N.W.2d 132, 139 (1976) (holding that "[ a]ny duty owed to the public generally is a duty owed to individual members of the public" and being guided by public policy considerations when considering whether liability should be imposed for torts).
[14] See Chambers-Castanes, 100 Wash.2d at 290, 669 P.2d 451; J & B Dev. Co., 100 Wash.2d at 308, 669 P.2d 468; Taylor v. Stevens County, 111 Wash.2d at 172, 759 P.2d 447; Taggart v. State, 118 Wash.2d 195, 229, 822 P.2d 243 (1992).
[15] Because of the discretionary and policy making functions of government, I would retain our absolute and qualified immunity jurisprudence.